**WALL PRODUCTS CO. et al., Plaintiffs,**

v.

**NATIONAL GYPSUM CO. et al.,
Defendants.**

Civ. Nos. 46414, 46455, 46487, 46640, 47195–47197, 47323, 48214, 48235, 48549, 48550, 48773–48784, 48787–48789, 48797 and 48798.

United States District Court,
N. D. California.

March 18, 1971.

———◆———

Frederick P. Furth, John H. Boone, San Francisco, Cal., Robert H. Weir, San Jose, Cal., for plaintiffs.

Thelen, Marrin, Johnson & Bridges, Gordon Johnson, Frank D. MacDowell, Michael B. Anderson, San Francisco, Cal., for defendant Kaiser Gypsum Co., Inc.

Dinkelspiel, Steefel, Levitt, Weiss & Donovan, Richard C. Dinkelspiel, Lenard G. Weiss, Anthony T. Miller, San Francisco, Cal., for defendant National Gypsum Co.

McCutchen, Doyle, Brown & Enersen, Morris M. Doyle, Frederic A. Sawyer, Larry B. Dent, San Francisco, Cal., for defendant United States Gypsum Co.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

On October 27, 1969, pursuant to pretrial orders previously entered by this Court, trial began in the 24 above numbered civil actions filed by six different dealer plaintiffs [1] seeking to recover damages for alleged violations by four named defendants of the state and federal antitrust laws. By stipulation of the parties, filed November 27, 1968, jury trial was waived and trial was held before the Court sitting without a jury.

Pursuant to pretrial orders No. 15, dated April 1, 1969, and No. 17, dated June 26, 1969, the issues of the first phase of the trial were limited to alleged violations by defendants of Section 1 of the Sherman Act (15 U.S.C. § 1), and impact on the dealer plaintiffs. Broadly stated, the issue presented was whether any of the defendants combined, conspired, or agreed with any other defendant or co-conspirator in violation of Section 1 of the Sherman Act.

Defendants filed answers denying the material allegations of the complaint and after 23 pretrial orders had been entered, trial commenced before the Court on the date hereinabove stated.

█ Plaintiffs in their post-trial brief assert that the principal acts of the defendants' combination and conspiracy were (1) the stabilization of prices and elimination of competition through verification of price and terms exceptions; and (2) direct price fixing through the concerted withdrawal of price and terms exceptions occurring on December 15, 1965 (price); on March 1, 1966 (credit); and in late 1966 (packaging).[2]

---

1. In addition to these cases involving the so-called "dealer" plaintiffs, the Court has pending before it approximately 60 additional so-called "backburner" cases, which involve purchasers of gypsum wallboard other than dealers (e. g., contractors, tract builders and other end-users), many of which were transferred to this district for discovery purposes by order of the Judicial Panel of Multidistrict Litigation.

2. The evidence as to the late 1966 packaging practices of the defendants is inadequate to justify a claim of anti-trust violation. Other activities of the defendants which the plaintiffs assert in support of their claim that defendants violated Section 1 of the Sherman Act, which the Court, except for the limited purposes hereafter indicated, finds to be without merit are: (a) the attempt to procure Trade Practice Rules from the Federal

After plaintiffs had presented their evidence and concluded their case, defendant Fibreboard Corporation moved for dismissal of the cases against it (Nos. 48549, 46640, 48797, 48214 and 48798). On February 19, 1970, the Court granted said motion and on April 17, 1970, made and entered its findings of fact, conclusions of law and judgment in favor of Fibreboard.

Following the granting of Fibreboard's motion, the remaining defendants presented their evidence. The remaining defendants are United States Gypsum Company (hereinafter referred to as "USG"), National Gypsum Company (hereinafter referred to as "National") and Kaiser Gypsum Company (hereinafter referred to as "Kaiser").[3] Plaintiffs offered no rebuttal evidence. On March 19, 1970, the taking of evidence was concluded and the Court took the cases under submission, subject to the presentation by the parties of proposed findings of fact and conclusions of law, together with supporting briefs.

The Court, having considered the evidence, the proposed findings, briefs and arguments of the parties, makes the findings and conclusions of law hereinafter set forth in this memorandum opinion.

In its consideration of the claims of plaintiffs that defendants engaged in the conspiratorial activities asserted in (1) and (2) above, the Court will treat each claim separately. Preliminary thereto, the Court deems it advisable to and makes its findings as to the Court's jurisdiction, the parties to the litigation, the nature of the product involved, the structure and performance of the industry, the economic climate in which such industry operated during the years involved in this litigation and the pricing practices of the industry. The factual background relating to the withdrawal of price and terms exceptions occurring on December 15, 1965 and March 1, 1966 will be separately reviewed, following the Court's ruling on the effect of the verification communications of the defendants as to price and terms exceptions (deviations from list or published prices and terms).[4]

Trade Commission, activities which clearly come within the protective shield of the *Noerr-Pennington* doctrine. Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L. Ed.2d 626 (1965). (Although the *Noerr-Pennington* doctrine shields these activities of the defendants, it does not preclude consideration of the nature of such activities as it may bear upon the March 1, 1966 withdrawal of terms exceptions) ; (b) activities of the defendants relating to the Gypsum Asssociation; (c) activities of the defendants relating to other trade associations; (d) credit investigation and administration, including activities of credit associations; (e) communications and contacts of defendants connected with social activities; (f) USG's commitment register filed with Arthur Andersen & Company, except in so far as it may bear upon the nature of USG's commitment to its November 17, 1965 announcement to withdraw price exceptions; (g) truck shipments; (h) sale of materials to a competitor or purchase of materials from a competitor; and (i) patent licensing, patent litigation and related matters.

3. Kaiser Cement and Gypsum Corporation was named a party defendant in Civil Action No. 48235. The parties have stipulated that Kaiser Cement and Gypsum Corporation has not at any time manufactured, sold or delivered any gypsum wallboard ·or related products and there being no evidence to the contrary, by order of the Court dated March 12, 1970, Kaiser Cement and Gypsum Corporation was dismissed as a defendant.

Richard L. Downing, Laura M. Downing, David E. Wiley, Clayton Berg, Kenneth Palmer and Mary Jane Walker were each named parties plaintiff to certain of these actions. By order of the Court entered March 17, 1970, each of said individuals was dismissed as a plaintiff.

4. As used herein the term "price deviation" refers to any price lower than a particular producer's list or published price; however, such lower price may have been characterized in the record. Such broad use of the term was adopted by the Court and counsel during the

*Jurisdiction.*

The Court has jurisdiction of the subject matter and the parties to this litigation. Its jurisdiction to adjudicate the claims of plaintiffs under Section 1 of the Sherman Act and the proper venue of these cases has been conceded by all parties. Except as otherwise stated or required by context, the facts found in this memorandum opinion occurred or existed within the period January 1, 1959 to December 31, 1968, and occurred or existed within the continental United States.

*Parties Plaintiff.*

Plaintiff Wall Products Co. is a California corporation organized in October, 1960. It actively engaged in business exclusively as a dealer in wallboard from July, 1963 to August or September, 1966, under various fictitious names, including "Delta Supply."

Plaintiff Ranier Enterprises, Inc. is a California corporation organized in August, 1964. It actively engaged in business exclusively as a dealer in wallboard from September, 1965 through June 30, 1966, under the fictitious name of "Delta Counties Supply."

Plaintiff Cover-All Building Materials, Inc. is a California corporation organized in February, 1964. It actively engaged in business exclusively as a dealer in wallboard from February, 1964 to 1967.

Plaintiff Di-Wal Building Materials was a partnership composed of David C. Walker and George DiCesare. It commenced business as a dealer in various building materials including wallboard in February, 1962. In early 1963 Walker purchased DiCesare's partnership interest and thereafter operated Di-Wal Building Materials as a sole proprietorship engaged in business as a dealer in wallboard. At varying times from February, 1962 to early 1967 Walker operated yards in San Rafael, Vallejo, Santa Rosa, Berkeley, San Jose and Castroville, California. His expansions were financed largely through extensions of credit from the gypsum wallboard producers.

Plaintiff Di-Wal, Inc. is a California corporation organized in July, 1964. In July, 1964 Walker transferred the assets of Di-Wal Building Materials in San Rafael to Di-Wal, Inc., and Walker has always been its president and sole shareholder. Di-Wal, Inc. actively engaged in business exclusively as a dealer in wallboard from July, 1964 until early 1967.

Plaintiff Walker Wallboard Company, Inc. is a California corporation organized in May, 1965. It conducted business under the fictitious name of "Di-Wal, Ltd." and actively engaged in business exclusively as a dealer in wallboard from May, 1965 until early 1967 with its principal place of business in San Francisco.

Plaintiff Klamath Lumber Company of San Carlos is a California corporation organized in 1952. It actively engaged in business as a distributor of building materials, including wallboard, from 1952 until approximately February, 1968.

Plaintiff E & M Supply Company is a California corporation organized in November, 1963. It actively engaged in business as a dealer in gypsum products and roofing materials from November, 1963 to September, 1967. Since early 1965 it dealt exclusively in gypsum products.

Plaintiff California Supply Company of San Jose, Inc. is a California corporation organized in April, 1948. Plaintiff John Azland is the duly appointed trustee of the bankrupt estate of this plaintiff corporation (adjudicated December 30, 1966). It actively engaged in business as a distributor of gypsum wallboard from 1950 or 1951 to May or June, 1966 when its products were sold to plaintiff Wall Products Co. Prior to 1964, California Supply Company of San Jose was the largest volume gypsum wallboard dealer in Northern California.

course of the trial. Some defendants, including United States Gypsum Company, referred to their price deviations as "price adjustments" and designated a price adjustment by the initials "PA."

*Parties Defendant.*

Defendant United States Gypsum Company (USG) is a corporation organized under the laws of the State of Delaware with its main office in Chicago, Illinois. USG manufactures a variety of products, including gypsum wallboard.

Defendant National Gypsum Company (National) is a corporation organized under the laws of the State of Delaware with its main office in Buffalo, New York. National manufactures a variety of products, including gypsum wallboard.

Defendant Kaiser Gypsum Company, Inc. (Kaiser) is a corporation organized under the laws of the State of Washington with its main office in Oakland, California. Kaiser manufactures insulated wallboard products and gypsum products, including gypsum wallboard.

Defendant Fibreboard Company (Fibreboard), as to whom the Court granted a motion to dismiss, is a corporation organized under the laws of the State of Delaware with its main office in San Francisco, California.

Plaintiffs have from time to time alleged or asserted that certain other gypsum wallboard producers, listed below, were co-conspirators with the named defendants. For the purposes of brevity such other producers will be referred to herein by the indicated abbreviated terms:

| | |
|---|---|
| The Flintkote Company and The Blue Diamond division of The Flintkote Company | Flintkote or Blue Diamond |
| American Gypsum Co. (now a division of Susquehanna Corp.) | American |
| Georgia-Pacific Corp., Bestwall Gypsum Division | Georgia-Pacific or Bestwall |
| Fabricated Products Division and Barrett Division, Allied Chemical Corporation | Allied |
| Dierks Forests, Inc. | Dierks |
| Grand Rapids Gypsum Company | Grand Rapids |
| Texas Gypsum Company | Texas Gypsum |
| Republic Gypsum Co. | Republic |
| The Celotex Corporation a division of Jim Walters Corporation | Celotex |
| Johns-Manville, Inc. | Johns-Manville |
| The Ruberoid Co. | Ruberoid |
| Big Horn Gypsum Company | Big Horn |

Flintkote was named as a party defendant in some of these actions but was voluntarily dismissed as a party prior to trial. During the course of the trial plaintiffs' counsel asserted that Bestwall was sometimes in and sometimes out of the alleged conspiracy.

The Gypsum Association is a trade association founded in 1930 by 13 producers of gypsum products. In 1962 the Association was incorporated under the Illinois Not-For-Profit Corporation Act. At the time of trial its members were Celotex, Flintkote, Georgia-Pacific, Grand Rapids, Kaiser, National, Republic, Texas and USG. Its members at the time of trial produced over 90 per cent of the products made from calcined gypsum in the United States.

Each defendant is or has been engaged in interstate commerce in the manufacture, distribution and sale of gypsum wallboard and gypsum wallboard is sold and shipped in interstate commerce by the other producers of gypsum wallboard with whom the defendants compete.

*Product Description and Industry Structure and Performance.*

The principal product involved in these cases is gypsum wallboard (wallboard) which is made from the mineral gypsum ($CaSO_4 2H_2O$), one of the commonest minerals in existence, found all over the world with many large deposits in 23 states in this country. It is found in rock form and is extracted by blasting the face of the mine or quarry. After it is crushed, ground and calcined (cooked) to drive out the water of crystallization, it is known as plaster of Paris or stucco. When water is added back to stucco the gypsum reverts to its original rock form.

Wallboard is made from essentially the same stucco that is used for wall plaster. The stucco is mixed with water to form a slurry which is then imposed upon a moving sheet of paper and another sheet of paper (both fed from rolls) is super-

imposed on the top of the stucco. As this "sandwich" moves along a long belt the stucco sets and reverts to its original rock form. At the end of the board machine a knife cuts the typically four foot wide wallboard into adaptable lengths. After passing through a kiln where excess moisture is removed, the board attains its maximum strength.

Because of the inherent fireproofing qualities of gypsum wallboard and continuous developments and improvements made in it, the product grew in acceptability as a wall covering. The demand for such wallboard increased at a rapid rate after World War II and in 1969 it probably accounted for well over 90 per cent of all interior partitions and ceilings in one and two family residential construction. Gypsum plaster accounts for most of the remaining residential partition and ceiling construction. The demand continued substantially unabated into the early 1960's and during this period most gypsum companies were operating at a very high level of capacity utilization, frequently exceeding the rated capacity of the then existing facilities to produce and supply gypsum wallboard.

Total demand for gypsum wallboard is not materially influenced by changes in the current price of gypsum wallboard since the cost of wallboard is a relatively small element in the total cost of a residential or commercial structure. The cost of gypsum wallboard used in the construction of an average sized house calculated at approximate 1969 published prices in the San Francisco Bay Area is $382. This compares with the total estimated construction cost of an average house for 1968 of $18,000 (not including the cost of the land, builder's profit or financing cost). Otherwise stated, the cost of wallboard amounts to only about 2 per cent of the total construction of a typical house. As a consequence, the demand for such wallboard is inelastic to price and even substantial changes in gypsum wallboard prices are not likely to change the quantity consumed.

Between 70 per cent and 75 per cent of the wallboard sold is ½ or ⅝ of an inch in thickness with ½ inch predominating. With relatively few exceptions the wallboard purchased by plaintiffs in these proceedings was ½ or ⅝ of an inch in thickness.

Gypsum wallboard is a homogeneous product in that there are no substantial quality differences between brands. Buyers ordinarily select a particular brand of wallboard for reasons other than quality. Each brand of wallboard is interchangeable in use with any other brand of wallboard.

Gypsum plaster and gypsum wallboard prior to World War II were sold by gypsum producers to lumber and building material dealers located in practically every community throughout the country. The function of the lumber and material dealer was to warehouse the product and sell it to local contractors and homeowners as needed for use in the erection and repairing of walls and ceilings. Gypsum plants producing wallboard were not built to have much storage space—the storing of the product was one of the functions of the dealer.

The huge demand for housing which began immediately after World War II and the speed with which gypsum wallboard could be installed, necessitated new distribution practices and brought into being the specialty wallboard dealer, the class of purchasers represented by the plaintiffs.

This greatly accelerated demand for housing brought with it large tract builders, building two or three hundred or more homes at a time, having for their basic objectives speed of installation and economy. Gypsum wallboard was a natural product for such builders. To obtain the speed and expertise that ordinary carpenters did not provide, such builders subcontracted the wallboard installation work to contractors who became known as Special Wallboard Applicators. The special wallboard applicator improved the technique of attaching

wallboard to the stud and taping the joints to make a smooth, monolithic surface. The increased availability of such wallboard applicators (trained mechanics with new tools) increased the acceptability of wallboard in building construction and by 1960 the use of wallboard in walls and ceilings had far exceeded the use of plaster. To meet these changes, occasioned by the accelerated demands of the applicators, increased stocking facilities and prompt delivery service of a quality not normally supplied by local lumber or building material dealers, there came into being specialty wallboard dealers, who operate relatively small businesses possessing the necessary equipment and offering the convenience of location needed to provide these special services.

With the increased usage of wallboard, gypsum producers enlarged their existing wallboard production facilities and built new plants, and the new entrants into the industry also built new plants. During the period 1945 to 1960 the capacity to manufacture gypsum wallboard more than tripled.

The continuing increased ratio of demand to capacity brought relatively stable prices and industry profits were quite attractive. This, combined with the general expectation that the 1960's would see a further boom, resulted in another period of rapid expansion in gypsum wallboard capacity and made new entry into the industry relatively easy for those prepared to undergo the substantial initial cost of plant construction.

The gypsum wallboard industry in the United States is oligopolistic in structure and because the product is basically homogeneous or undifferentiated it is described by defendants' expert as "a classic type of undifferentiated oligopoly."

In 1960 industry capacity, expressed in millions of square feet (MMSF) of ½ inch wallboard on a 290 day year basis, was approximately 8,388. This capacity rose to 9,698 in 1963, 9,933 in 1964, 10,-795 in 1965, 11,440 in 1966, 11,519 in 1967 and 11,822 in 1968. Thus a total of 3,434 MMSF of capacity was added during this 8-year period (an increase of 41 per cent). A substantial portion of this increment (1,507 MMSF or 44 per cent) was added during the years 1965 and 1966. In comparison, only 235 MMSF of capacity were added during the year 1964 and only 79 MMSF during 1967. The defendants USG, National, Kaiser and Fibreboard, together with Flintkote, added 1,287 MMSF of capacity during the two year period of 1965 and 1966, accounting for about 85 per cent of the total capacity added by the industry during those years. The period 1960 to 1968 was a period of significant growth for single plant producers. The number of single plant producers tripled during this period and the total capacity of all such producers was expanded from approximately 300 MMSF to 900 MMSF. By the end of 1968 single plant producers thus accounted for 7.8 per cent of total industry capacity as compared to the 3.8 per cent of total industry capacity which they held in 1960. Seventeen plants were added throughout the United States during the period 1960 to 1968 with the result that there were 78 operating plants in 1968. The defendants owned 50 of these plants, distributed as follows: USG 24, National 19, Kaiser 6, and Fibreboard 1.

Over the period 1960 to 1968 the nationwide gypsum wallboard market shares of the two largest producers, USG and National, declined while there was a significant increase in the market shares of the other smaller multiplant producers. The number of single plant producers increased from two in 1960 to six in 1968.

USG's share of the gypsum wallboard market in the United States in 1960 was approximately 43 per cent. This share declined steadily thereafter to a low point of 31.5 per cent in 1967 and then increased to 33.2 per cent in 1968. National's share of said gypsum wallboard market in 1960 was approximately 28.4 per cent. This share declined steadily thereafter to 21.2 per cent in 1968. Kaiser's share of said gypsum wallboard market in 1961 was approximately 5 per cent. This share declined steadily thereafter

to a low point of 4.6 per cent in 1966. This market share increased thereafter to 6.5 per cent in 1968. Flintkote's share of said gypsum wallboard market in 1964 was approximately 5 per cent. This share steadily rose thereafter to about 7 per cent in 1968. Fibreboard's share of said gypsum wallboard market in 1960 was approximately 3 per cent. This share increased thereafter to 4 percent in 1963 and declined steadily thereafter to less than 1 per cent in 1968. Fibreboard ceased selling gypsum wallboard in 1969.

The share of producers other than defendants and Flintkote of said gypsum wallboard market in 1960 was in the range of 15 to 20 per cent. This share rose steadily thereafter to about 32 per cent in 1968.

In 1968 the industry was composed of 14 producers with the two largest producers having 56.4 per cent of industry sales. The four defendants and Flintkote had 71.5 per cent of the industry capacity and accounted for 68.3 per cent of industry sales. The remaining nine producers had 28.5 per cent of the industry capacity and 31.7 per cent of industry sales; three of these were multiplant producers with 20.6 per cent of the industry capacity and six were single plant producers with a combined total of 7.8 per cent of the industry capacity.

The structure of the gypsum wallboard industry in the 16 counties surrounding San Francisco Bay is also oligopolistic. These counties are Alameda, Contra Costa, Marin, Monterey, Napa, Sacramento, San Benito, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma, Stanislaus and Yolo. In the year 1968 USG accounted for 19.5 per cent of the sales in this Bay Area market, National accounted for 14.4 per cent, Kaiser accounted for 19.7 per cent, Flintkote accounted for 17.1 per cent, Fibreboard accounted for 3.9 per cent and all remaining producers accounted for 25.4 per cent. As in the national market, there was in the Bay Area market during the mid-1960's a substantial decline in the market shares of USG and of defendants as a group.

USG's share of the Bay Area gypsum wallboard market in 1963 was approximately 38 per cent. This share declined steadily thereafter to a low point of 16.5 per cent in 1967 and increased to about 20 per cent in 1968. National's share of the Bay Area gypsum wallboard market in 1963 was approximately 5 per cent. This share rose steadily thereafter to a high point of 15.5 per cent in 1967 and thereafter declined to 14.4 per cent in 1968. Kaiser's share of the Bay Area gypsum wallboard market in 1963 was 26 per cent. This share rose to a high point of 27.7 per cent in 1964 and declined steadily thereafter to 19.7 per cent in 1968. Flintkote's share of the Bay Area gypsum wallboard market in 1963 was 16.4 per cent. This share declined steadily thereafter to a low point of 13.0 per cent in 1965 and fluctuated up and down thereafter to a high point of about 17 per cent in 1968. Fibreboard's share of the Bay Area gypsum wallboard market in 1964 was 11.5 per cent. This share rose thereafter to a high point of about 13 per cent in 1966 and thereafter declined to about 4 per cent in 1968. Fibreboard ceased selling gypsum wallboard in this market in 1969. The share of producers other than defendants and Flintkote of the Bay Area gypsum wallboard market in 1963 was less than 5 per cent. Their share of this market thereafter rose steadily to a peak of about 25 per cent in 1968.

There was a substantial amount of shifting from seller to seller by the buyers in the Bay Area market. They customarily purchased from more than one supplier and in varying proportions.

There is a very close relationship between residential construction and the demand for gypsum wallboard. There is also a very close relationship between the general availability of credit and residential construction. As construction increases, the amount of wallboard used increases and conversely, slumps in construction activity show up in decreased demands for gypsum wallboard.

The total value of residential construction put in place in California dropped from $3.5 billion in 1963 to $3.2 billion

in 1964, to $2.5 billion in 1965 and to $1.6 billion in 1966. The prime rate of interest in the San Francisco Bay Area was 4½ per cent from August, 1960 to December, 1965, when it rose to 5 per cent. Thereafter the rate rose steadily, except for a slight decline during 1967, to 7 per cent in January, 1969.

In the period 1964–1965 the rate of growth in demand for gypsum wallboard began to decline. The principal causes for this decline were the increasing satisfaction of the post-war demand for new housing units and the lessening growth in demand attributable to substitution of gypsum wallboard for other wall coverings, the latter for the reason that by the mid-1960's gypsum wallboard already constituted between 80 per cent and 90 per cent of all residential wall construction. During the same period, construction was completed on new and expanded wallboard manufacturing facilities which had been independently planned and commenced in the early 1960's by defendants and other producers. The decline in construction began earlier and was more severe in California than in the United States generally.

USG's net earnings for 1960 were 14.4 per cent of assets applicable to gypsum wallboard. This annual rate of return declined steadily to a low point of 7.6 per cent for 1968, except for a slight upturn for 1967. The quarterly net earnings as a percentage of such assets for 1964 and 1965 were as follows:

| Quarter | 1964 | 1965 |
|---------|------|------|
| 1st Q | 11.6% | 8.4% |
| 2nd Q | 14.7 | 10.7 |
| 3rd Q | 14.4 | 10.6 |
| 4th Q | 9.8 | 7.1 |

National's company-wide net earnings as a percentage of the company's total net worth for the year 1960 was 10 per cent. This rate declined steadily to a low point of 6.1 per cent for 1966 and 1967, and then rose to 7.0 per cent for 1968. National's quarterly net earnings as a percentage of net sales for 1964 and 1965 were as follows:

| Quarter | 1964 | 1965 |
|---------|------|------|
| 1st Q | 15.0% | 11.6% |
| 2nd Q | 15.2 | 12.1 |
| 3rd Q | 14.9 | 9.9 |
| 4th Q | 12.5 | 6.1 |

Kaiser's net profit, before taxes, as a percentage of fixed assets applicable to gypsum products for 1960 was 3.1 per cent. This rate rose steadily to a peak of 10.4 per cent for 1963, declined to 4.2 per cent for 1964 and thereafter for each of the years 1965 through 1968 Kaiser experienced losses which for 1967 reached a loss of 4.7 per cent of its fixed assets applicable to gypsum products.

Fibreboard's Gypsum Division sustained a net loss for 1960 of $582,000 and earned a net profit for 1961 of $216,000. Fibreboard's Gypsum Division's net profits increased steadily thereafter to a peak of approximately $1.1 million for 1963 and then declined for 1964 to approximately $800,000. For each of the years 1965 through 1968 Fibreboard's Gypsum Division sustained losses reaching approximately $1.2 million for the year 1966.

Flintkote's gypsum divisions' net profits for 1960 were approximately $2 million. These profits rose to a peak of about $2.4 million for 1962 and then declined steeply to losses of more than $1 million for each of the years 1965 and 1966. Thereafter these divisions earned small profits of about $150,000 for 1967 and 1968.

USG and National each had total company assets in the range between $250 million and $1 billion. The average percentage return on net worth after taxes for the years 1960 through 1968 of all U. S. manufacturing corporations having assets in the range between $250 million and $1 billion compared with the returns on net worth, company-wide, of

USG and National for the same period were as follows:

| Year | All Mfg. Corps. | USG | National |
|------|------|------|------|
| 1960 | 9.6% | 12.7% | 10.0% |
| 1961 | 9.3 | 11.7 | 8.7 |
| 1962 | 9.2 | 11.3 | 8.6 |
| 1963 | 9.6 | 11.7 | 8.6 |
| 1964 | 10.9 | 12.0 | 8.2 |
| 1965 | 12.4 | 9.4 | 6.6 |
| 1966 | 12.9 | 8.3 | 6.1 |
| 1967 | 11.6 | 7.9 | 6.1 |
| 1968 | 12.0 | 8.2 | 7.0 |

*Pricing Practices in the Industry.*

a. *General Pricing Practices.*

Prior to about 1962, Gypsum Wallboard was sold in most of the country delivered to the customer on an F.O.B. plant price plus carload rail freight to the customer. When there was a freight advantage, as a result of which the delivered price to a customer from a competitor's plant was lower, the freight was equalized to match the competitor's delivered price. The two notable exceptions to this pricing system were the East Coast and California where zone delivered pricing was used.

The F.O.B. system of pricing, with the equalization of freight frequently necessary to be competitive with another competitor's plant, became increasingly difficult and complex. F.O.B. plant prices were not always the same, product weights varied from company to company, new plants were constructed from which it was necessary to calculate freight, a more complex product line with varying weights was developed and the adoption of truck delivery in some parts of the country, made it very difficult to compute the price to the customer. As a result of the problems caused by F.O.B. pricing, zone-delivered pricing was adopted in various parts of the country at various times. After 1962, most of the country was divided into delivered price zones, and in 1965 this process was completed with the zoning of the remaining parts of the country. It was then easier for the sales force and the customers to know what the price was. As a result of these changes, by the end of 1965, all gypsum was sold on the basis of zone delivered pricing. At that time, USG and National had 148 price zones in the United States, while the other manufacturers had somewhat fewer zones due to their not selling wallboard in all parts of the United States.

Zone-delivered prices were arrived at by taking into account plant locations, lower competitive prices in areas that were closer to competitors' plants, the cost of transporting the product to the market, and possible price discrimination where competing dealers were located in close proximity to each other on opposite sides of a zone boundary line.

Where plants of competing producers were different distances from a particular market, their list prices for delivery in that zone were ordinarily the same regardless of the distance. This was so because the distant competitor, in order to compete in that market, had to meet the price of its competitor whose plant was in close proximity to the market. If the distant competitor wanted to enter the market and compete, his price had to be as low as his competitor's price even though his freight cost was higher. This required a more distant producer to absorb freight with a resulting decrease in its mill net.

The proximity of a gypsum wallboard producer's manufacturing plant to a particular market area had a substantial effect upon its ability to compete in and serve that market area. Consequently, producers in several instances were faced with the alternative of constructing new plants or storage facilities in a particular marketing area or withdrawing from that market. For example, Kaiser was forced to cease its sales of gypsum wallboard and to withdraw from the Texas market because the freight cost from its Rosario, New Mexico plant did not permit it to compete in the Texas market (other than in the El Paso area) and show a sufficient return. Similarly USG constructed gypsum wallboard plants at the following locations after a competitor's plant was built or announced in the area: Santa Fe Springs, California;

New Orleans, Louisiana; Jacksonville, Florida; Shoals, Indiana; Sigurd, Utah; and Baltimore, Maryland. USG also found it necessary to build a storage warehouse in the Bay Area to meet competitive conditions in that market. The following gypsum wallboard producers built plants at the following locations after USG had a plant in the area: Flintkote at Sweetwater, Texas; Kaiser at Jacksonville, Florida; Bestwall, National, Kaiser and Flintkote in the Philadelphia area; Bestwall in the New York area; and National at Lorain, Ohio and at Waukegan, Illinois.

From at least as early as World War II, most of the gypsum companies have had published prices for gypsum wallboard. The formality of the published prices varied from company to company and from time to time. Some companies published prices in written form. Others only wrote letters to the trade announcing the dollar amount of a price increase or decrease, while yet other companies at certain times published their prices by word of mouth through their salesmen. It was the policy and objective of USG, National, Kaiser, Fibreboard and Flintkote to sell at these published or list prices. The general exception to this policy and practice was to meet competition.

A similar procedure was followed with regard to other terms and conditions of sale. The various gypsum companies had standard policies and procedures of rail or rail and truck deliveries, packaging of wallboard, credit and cash discount terms, job protection, and points of delivery. The general exceptions were again to meet competition.

As a general rule the published or list prices of the basic wallboard sizes in a geographical zone are the same for the major wallboard producers. The terms and conditions of sale, while they may vary from time to time, also tend toward uniformity.

The overwhelmingly important factor influencing the buyer's decision as to which brand of wallboard to buy is price. There is little to choose among the products of the various companies. The buyers are informed technical buyers and the product is tailored to the usage to which they put it, (i. e., it is uniquely designed for building walls and ceilings) so the choice as to seller is not conditioned in any very significant way by brand name or by differences in quality of the product. Even terms and conditions of sale are capable of being translated into monetary equivalents to a considerable degree and tend toward uniformity. There may be some service elements which one company is more capable of offering than another, but these are of lesser importance. As a result, it is exceedingly difficult for one wallboard manufacturer to sell its product at a higher price than its competitors.

The changes in the demand capacity situation that overtook the industry in the early 1960's had an unsettling effect on pricing. With a lower utilization of capacity plant costs go up. In order to reduce the fixed overhead there were strong incentives to cutting prices, extending credit, or "any kind of thing you could get to get an order." However, there was no sales advantage to publish a lower price. Competition would only promptly meet the lower prices and since total demand was inelastic, the company would sell the same amount of wallboard at a lower price. As a result, price deviations increasingly appeared in the market in the form of exceptions to published (list) prices or terms.

While it was the policy of all the defendant companies to sell only at list prices, all (until December 15, 1965) excepted meeting competition from this policy. Thus the deviations, when once introduced had a snowballing effect that affected the entire market. With respect to California, Mr. Harper, until recently the President of Kaiser, described this process as follows:

What happened is that you had firms like American, Republic, Texas—I am just using those three—who were new plants and the market was very very poor in their marketing area. So what they did was to sell in California. It

was a long haul, but they would reduce the price. That was to, how would you say, justify their ever building the plant or otherwise the plant would have not worked at all. So they shipped out of here and those of us who were in California which at that time was USG, Blue Diamond, Pabco and ourselves, in order to retain the volume of products that we had been selling, we had to meet their prices. Other witnesses similarly expressed the view that the greatest price deterioration was occurring in the areas where there was the greatest competition from the single plant producers.

The purchasers of wallboard were prompt in exploiting any weakness in the market and pressing for concessions. They would often attempt to play one manufacturer against another for better prices or terms with the ultimate result that the number of exceptions and deviations spread through the industry. In attempting to remain competitive in the face of increasing reports from the field of deviations, the individuals in the various manufacturing companies with pricing authority were concerned with the uncertainty surrounding reports of claimed competitive deviations. To receive an actual invoice or quotation was extremely difficult. Generally, the decision had to be made on the basis of a judgment of the market and the persons involved with recourse to verification where necessary to avoid violation of the Robinson-Patman Act. Otherwise, defendants faced the ever present dilemma of going too low and possibly causing further price deterioriation or not going low enough and losing the business.

In a commodity market in which the products are homogeneous, as is the case with gypsum wallboard, list prices are usually uniform within each marketing area. List price uniformity is even more likely where the principal buyers of such homogeneous products follow the practice of having two or more suppliers of the products. Under such conditions it becomes increasingly difficult for a producer to successfully sell at a higher price than its competitors, and if it sells at a lower price, competitors will quickly learn of it and meet it, thus resulting in uniform prices again, but at a lower level and without any increase in the producer's share of the market. Except when necessary to meet special conditions in a particular marketing area or as to a particular customer, list price and actual selling price generally coincided.

Up to and until December 15, 1965, it cannot be said that the existence of uniform list prices and contemporaneous changes in list prices by competing gypsum wallboard producers resulted from other than conditions of the market and the industry. Each producer was able to and did obtain from its customers almost immediate knowledge of the list price changes of competing producers. Changes or deviations *from* list price (as contrasted to changes *in* list price) were obtained from the customers and were often verified in the manner hereinafter described.

Increases in the price of gypsum wallboard were usually announced by the initiator of the price increase substantially in advance of the effective date in order to afford an opportunity for customers to meet their existing resale commitments at current prices. In each instance one of defendants, usually USG or one of the other gypsum wallboard producers, initiated the price increase with the expectation that other sellers would follow the increase.

In many instances the announced increase was followed within a few days by first one and then another of the gypsum wallboard producers. In some instances other producers did not follow with similar announcements, and in such instances the initiator of the price increase and those who had followed found it necessary to withdraw their announcements prior to the effective date thereof. In other instances, instead of following the announced price increase of the initiator, other producers announced different price increases. In those instances in which a competitor announced a lesser

increase, the initiator found it necessary to conform its price changes to those of that competitor. A producer who did not withdraw or conform an announced price increase which had not been followed by other major producers found it difficult, in the conditions of the market, to remain an effective competitor. No one producer was always the price initiator. For example, on two occasions Kaiser initiated price increases in West Coast marketing areas but was compelled to withdraw them because its major competitors in the marketing areas involved did not follow Kaiser. Georgia Pacific and National also initiated price changes. Each gypsum wallboard producer if it followed the initiator of a price increase with its own price announcement, usually adopted the same effective date. Each producer following the price announcements of others did not adopt an earlier effective date because it could make no sales of gypsum wallboard at the new higher price while other producers remained at the old and lower price. A later effective date was not usually adopted by such producers because to do so would cause gypsum wallboard producers who had announced an earlier effective date to postpone their effective date to the latest effective date, for the reason that those producers having an earlier effective date could not make any sales of gypsum wallboard at the increased price between that date and the latest effective date.

Gypsum wallboard producers, as a matter of customer relations, generally notified major customers of price increases by personal communication immediately prior to general distribution of price announcements to the trade.

Price reductions usually were effective immediately upon announcement or retroactively. This was so because if advance notice was given, customers withheld purchases until the effective date of the reduction. Usually price reductions were preceded by a period of time during which the producer found it necessary, to remain competitive, to grant numerous price deviations below its list prices.

Prior to 1962 most sales by gypsum wallboard producers, including defendants, were at list prices. Commencing sometime in 1962 and through to mid-December, 1965, a gradually increasing number of gypsum wallboard sales were made at off-list prices, in the form of individual price deviations to particular customers to meet competitive prices. Price deviations granted by one producer were usually quickly matched by competitors. The defendants individually adopted and followed the policy and practice of prohibiting the granting of price deviations except to meet competitive offers and each defendant through its officers testified that such deviations were made to achieve faithful compliance with the requirements of the Robinson-Patman Act and that the deviations were matched but not bettered because the Act's "meeting competition" defense to price discrimination does not sanction undercutting a deviation.

From time to time in the period from 1962 to December 15, 1965, many dealers, including plaintiffs, were receiving deviations below list price from one or more of the gypsum wallboard producers. In the case of plaintiffs, these deviations ranged from $1.00 to $4.00 off list, depending upon the time, the plaintiff and the producer. These price deviations tended to spread and to cause sufficient pressure on list prices to force them down. Thus, reductions in list prices usually reflected a recognition that actual selling prices already had in fact declined.

Despite their stabilizing effect on price, up to and until at least about November 17, 1965, when USG announced its intention to withdraw price exceptions, effective December 15, 1965, it cannot be said that the foregoing described practices of the defendants were the result of unlawful agreement or conspiratorial conduct. They appear to have been the natural market reactions one would realistically expect in an industry composed of relatively few sellers of a homogeneous product and the inevitable consequences of defendants' efforts to

comply with the requirements of the Robinson-Patman Act. There is no substantial or clear evidence to the contrary.

Other significant competitive practices were "job price protection" and the use of cashier's checks payable from the producer to the dealer as a means of allowing the amount of the price deviation.

b. *Job Price Protection.*

The term "job price protection" in the gypsum wallboard industry refers to the practice of a producer in agreeing with a customer that the customer might purchase a sufficient quantity of gypsum wallboard from the producer to complete supplying a particular project at the existing or stipulated price. In those circumstances the customer was allowed to continue to purchase up to the protected quantity for the project, notwithstanding that list prices of the producer increased prior to the purchase of all of the gypsum wallboard required for the completion of the project. Job price protection was almost always granted on government jobs, and gypsum wallboard dealers were permitted to purchase the amount of wallboard required for the particular government job at the price in effect at the time the job was bid. Job price protection was also sometimes granted on non-government jobs by gypsum wallboard producers, including defendants. However, it was the policy and practice of each defendant, in order to comply with the Robinson-Patman Act, not to grant job price protection except to meet competitive offers of such protection to a customer by other gypsum wallboard producers. When job price protection was granted, it was given only for the requirements of a specific job and upon the understanding with the customer that the commitment would be reduced to the extent that the job was supplied by a competitor.

It was not unusual for a customer to seek job price protection commitments for the same job from several gypsum wallboard producers. Frequently, where there was a price increase before the job was finished, the customer would attempt to buy the full requirements for the job at the protected price from more than one of the gypsum wallboard producers who had granted him job price protection, falsely claiming to each such producer that all of the gypsum wallboard so purchased was for use on the protected job. When job price protection was granted on a project, the producer giving the protection kept a record of the job, its location and the quantity of wallboard required to complete it.

c. *Cashier's Checks.*

At various times some defendants delivered to dealer customers cashier's checks payable to such customers as a means of allowing the amount of price deviations. Consequently, there were numerous instances where price deviations were not shown on invoices or credit memoranda. Dealer customers often requested the use of cashier's checks. Another reason for such use was to maintain the secrecy of the transaction between the producer and the dealer. The use of cashier's checks became a competitive practice which was met by some competing producers.

d. *Verification Practices of Defendants.*

The officials of defendants who had authority to deviate from list prices in selling gypsum wallboard were at all times aware of and concerned with the limitations imposed by the Robinson-Patman Act[5] upon their right to cut prices to a particular customer. Such officials had been made aware by their attorneys of the requirements of the Robinson-Patman Act and particularly of the pro-

---

5. Section 2(a) of the Robinson-Patman Act makes it unlawful
"* * * to discriminate in price between different purchasers of commodities of like grade and quality * * *."
Section 2(b) provides that a seller may defend against a Robinson-Patman charge

"* * * by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor or the services or facilities furnished by a competitor." (15 U.S.C. § 13).

hibition against sellers discriminating among their customers and the right of sellers to meet in good faith a lawful offer of a competitor to a particular customer.

Reliable information concerning price deviations was difficult to obtain and to confirm as to its accuracy. In making representations to gypsum wallboard producers' salesmen concerning competitive prices, customers for reasons of self-interest were frequently evasive or deceptive about or misrepresented the prices offered to them by competitors. Many customers declined to exhibit or to furnish copies of invoices, credit memoranda or other written evidence which would enable the salesmen to confirm the accuracy of the claimed deviations. The use of cashier's checks made more difficult the obtaining of documentation to support or confirm the existence of price deviations. When verification occurred, it was often ascertained that the information furnished by customers on claimed deviations was erroneous.

As part of their concern over protecting themselves against the consequences of false information, the gypsum wallboard producers were also concerned over the fraudulent practice of some customers to solicit job price protection from more than one supplier and thereby to obtain at the lower protected price wallboard in excess of the quantity that had been committed to them.

On the advice of the attorneys for the respective defendants, certain of their officials were authorized to verify with a competitor the reported price offered or charged by such competitor to a particular customer. Pursuant to this advice, an official, on receiving a field report of a price deviation, would, after exhausting other means of confirming the truth of such reported deviation, communicate with an official of the competitor reportedly offering such deviation, state the reported price, the name and location of the customer involved, and ask whether or not the report was true. Pursuant to such advice, an official, on receiving such a communication, if he chose to respond, would reply by stating either that such report was true or that it was false.

Each defendant developed, with the advice and aid of its attorneys, its own system for reporting and documenting competitive activity. While there were some differences among the defendants in their procedures for reporting such activity, all of them utilized substantially similar forms for reporting such activity. Generally, with respect to claimed price deviations, the reporting salesmen were required to specify on the forms, among other things, the name of the customer or potential customer, the name of the competitor or competitors offering or giving the claimed price deviation, the amount thereof, the manner of giving it, and whether the reporting salesman had seen written evidence from which the truth of the claimed deviation had been confirmed. The forms required that, if obtainable, written evidence such as copies of invoices or credit memoranda be attached to the forms to substantiate the accuracy of the claimed deviation.

The forms of most producers provided that the price deviation was of limited duration. In Kaiser's case this was stated to be not more than 90 days because of the advice of Kaiser's attorney that under the Robinson-Patman Act a competitive price deviation could remain in effect only so long as the competitive situation on which it was based continued. Under Kaiser's established procedure, when the expiration date of a deviation authorization was reached, Kaiser's sales personnel checked in the field to ascertain that the competitive basis for the original authorization of the deviation still continued in effect before a renewal authorization was issued.

Verification among the competing producers was made by telephone [6]

---

6. Mr. Watt of USG described a typical verification telephone conversation as follows:

I would tell him I had a competitive report from my organization, that XYZ company had been offered or was buying

pursuant to a mutual understanding among the appropriate officials of defendants [7] and when made the defendants consistently followed the advice of their attorneys as above indicated. The evidence sustains a finding that verification calls were not made unless the caller had received a report from his company's field personnel of a claimed competitive price deviation offered or given to a customer by a particular competitor. There is no evidence that verification calls were made without the caller first exhausting other means at hand of confirming the reported deviation. A verification call was made only if, because of mistrust of the veracity of the customer involved or for some other reason, the caller remained uncertain of the accuracy of the report.

Without significant exception, the caller went no further than to state to the person called the name and location of the customer and the reported price, and to ask whether or not the report was true. The person called usually responded, either then or after obtaining the information, by stating

that the report was true or that it was false. Sometimes the person called declined to answer or avoided doing so. In a few instances there was verification of a lower price in a particular locality when a number of price deviations were reported to be in effect therein.

As the number of reports indicating sales of gypsum wallboard made by competitors at off-list prices increased, verification calls, also increased, reaching a maximum in 1965. Each defendant generally met such reported competitive prices when it was able to confirm the truth of the reports. When the truth of such reports could not be confirmed, the policy of each defendant required that there be no departure from its list price. In many instances, defendants' officials were able, without verification with competitors, reasonably to satisfy themselves, by various means, of the accuracy or inaccuracy of the deviation reports. These means included comparison of the report with other reports from the same area, confidence in the veracity of the customer claim-

---

at a price at such and so, or is this such and so and, would you tell me if this was accurate.

Other officers of defendant producers gave similar accounts. If the inquiring caller did not have the precise information and did not ask a question regarding a specific price or practice, a specific customer or specific area, USG would either refuse to answer or deny the report.

7. The cooperation or mutuality of the understanding among the officers of the defendant producers is explicitly evidenced from the testimony of Mr. Harper, Chief Executive Officer of Kaiser:

Q. Now, sir, how did you learn to call Mr. Saddler?

A. Mr. Saddler was the vice-president of sales for the United States Gypsum Company during that period.

Q. Did you ask him once, Can I call you from time to time to verify prices?

A. That is correct.

Q. What did he say, Yes, you may?

A. Yes.

Q. Then, did you tell him, Well, I'm the man to call if you want to verify prices of Kaiser?

A. That is correct.

Q. Did you ask each one of these fellows if you could call them to verify prices?

A. Didn't ask them; didn't have to. They asked me.

Q. Did Mr. Brown [National] ask you?

A. Yes.

Q. What did he say, do you recall?

A. He wanted to know whether or not it would be all right if he called me to verify prices, and I said yes.

Q. And did Mr. Galloway [Fibreboard] ask you a similar question?

A. Hm-hmm.

Q. Mr. Spence [Fibreboard]?

A. Correct.

Q. And Mr. Ross [Flintkote]?

A. That is correct.

Q. And Mr. Meyer [Bestwall]?

A. That is correct.

Q. So the only one you asked was Mr.—

A. Saddler.

Q. —Saddler.

ing the deviation and written evidence of the deviation, either seen or sent in by the field salesmen.

When the reported deviation could not be otherwise confirmed, the official having the competitive report before him, unless he elected to verify with a competitor, was compelled either to forego meeting the reported competitive deviation or to run the risk of a charge of price discrimination. It was only when confronted with these alternatives that defendants verified reported price deviations with competitors.

Though these verification calls had a tendency to stem the decline of prices, the fair and reasonable inference to be drawn from the practice is that such calls were made for the purpose of complying with the Robinson-Patman Act and as a means of protection against false representations by customers. There is no reliable evidence that the verification communications of the defendants were intended to serve other purposes. With respect to all defendants, when a reported price deviation by a competitor could not be confirmed, the official having pricing authority was, by the policy of his company, consistent with the Robinson-Patman Act, required to adhere to list price. It is thus clear to the Court that in making verification calls defendants attempted to abide by the provisions of the Robinson-Patman Act, which permitted them in good faith to "meet but not beat" competitive price deviations, even though this good faith meeting but not beating competitive price deviations, policed by a mutual understanding among the defendants to truthfully answer specific inquiries, had a tendency to stabilize price in that it retarded any downward spiral in price deviations.[8]

In addition to receiving from their field personnel reports of price devia-

tions by competitors, the officials of defendants also received reports of variances from published terms of sale, including furnishing of services. As used herein the term "terms of sale" refers to the various terms and conditions, other than price, under which gypsum wallboard was sold by the producers. In some instances the officials of some defendants communicated with the competitor who was reported to have offered such a variance to verify the existence thereof. Such verification calls related among other things to extended credit terms, cash discounts, methods of shipping, packaging and job protection. These calls, which were few in number, were responded to with a true or false answer in the same manner that responses were given to specific price deviation inquiries.

In their discussion of "the effect of verification" plaintiffs in substance contend that verification permitted the defendants to learn of a price deviation of which they otherwise would not have had knowledge and that consequently verification restricted the granting of price deviations. In advancing this argument plaintiffs ignore the uncontradicted evidence that the reports of price deviation *originated* in the *field* and were reported to headquarters. In many instances defendants were able, without verification with competitors, to satisfy themselves concerning the accuracy of the field reports. It was only in those instances in which a field report of a deviation could not be so confirmed that there was verification with a competitor. Thus, plaintiff's argument puts the cart before the horse. Verification communications did not lead to the discovery of price deviations. Instead, the discovery was made in the field and reported to headquarters, and

---

8. Mr. Harper, of Kaiser, when asked why he answered verification calls, said, "If you don't tell him you are giving him $2 off, he might give him three." And Mr. Atwell, of National, said he answered verification questions, so that a competitor would not meet an inaccurate price, thus forcing National to meet the new price; "The first thing I know, I would be meeting myself and that is why I answered them."

verification with a competitor occurred only when needed to meet the Act's "good faith" requirement in those instances in which the field report of a deviation could not be confirmed by other means.

*The Legality of the Verification Communications.*

Ever since the Supreme Court decision in United States v. Container Corporation, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed. 2d 526 (1969), plaintiffs have continuously asserted that that decision is controlling here, and that consequently the verification communications of defendants, engaged in long before the decision in *Container*, violated Section 1 of the Sherman Act. Although this Court recognizes that particular pricing information of the nature involved in the verification communications of the defendants in these cases lends itself easily to concerted price fixing activities and to an unconscious direct retardation of the downward trend of prices, and, hence, a stabilizing effect on price, nevertheless, because the Supreme Court made no reference whatever in its opinion in *Container* as to the availability of the "meeting competition defense" of Robinson-Patman, for reasons hereinafter indicated, this Court does not interpret *Container* as precluding a proven good faith Robinson-Patman defense. The manifest and basic distinctions between *Container* and the present litigation are: (1) the lawful purpose of meeting competition in good faith as required in the Robinson-Patman Act, which is clearly proven in these cases and which was absent, or at least not found by the Supreme Court, in *Container*; and (2) a further "controlling circumstance," protection against fraudulent misrepresentations by customers, which the Supreme Court found absent in *Container*, is also clearly proven in these cases. This court is

satisfied that gypsum wallboard is a homogeneous product demonstrably "of like grade and quality" within Robinson-Patman and that each defendant's concern about compliance with the Act was genuine and substantial.[9]

The Supreme Court in *Container* distinguished but did not overrule the earlier cases which approved an exchange of pricing information in proper circumstances. Indeed, the Court in *Container* specifically approved exchanges of price information by stating the "exception of *Container*" in the following language:

> While there was present here, as in Cement Mfrs. Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104, an exchange of prices to specific customers, there was absent the controlling circumstance, *viz.*, that cement manufacturers, to protect themselves from delivering to contractors more cement than was needed for a specific job and thus receiving a lower price, exchanged price information as a means of protecting their legal rights from fraudulent inducements to deliver more cement than needed for a specific job. (393 U.S. at 335, 89 S.Ct. at 511).

This quotation embraces three points: (1) in both *Container* and *Cement Manufacturers* there was involved an exchange between sellers of prices to specific customers; (2) there was absent from *Container* "the controlling circumstance" present in *Cement Manufacturers*; and (3) the controlling circumstance in *Cement Manufacturers* was that the exchange of price information between the sellers was a means of protecting their rights from fraudulent inducement by buyers. Thus, by recognizing and distinguishing *Cement Manufacturers*, *Container* excepts a case in which sellers exchange price

---

9. This justification for concern is further manifested by the fact that each of the plaintiffs here is also suing defendants for Robinson-Patman price discriminations. This latter issue was not included in the pretrial order that led to the instant phase of the trial. The pretrial order limited the immediate issue for trial to alleged violations of Section 1 of the Sherman Act.

information relating to specific customers where there is present a "controlling circumstance." Here the defendants' duty to establish good faith adherence to the dictates of the Robinson-Patman Act, constitutes a circumstance equally as compelling and controlling as that found in *Cement*.[10] To conclude otherwise would be manifestly unfair and unrealistic.

*Cement Manufacturers* was a suit brought by the government under the Sherman Act to enjoin the continued existence of a cement manufacturers association. The government complained, *inter alia*, that Section 1 of the Sherman Act was violated by an arrangement whereby the members of the association were required to report to it and that it disseminated to the membership information concerning what were termed "specific job contracts." Such contracts were in common use in the industry and amounted to an option to a contractor bidding on a particular job to purchase the quantity of cement which he required for that job at the price in effect when the contract was issued. Since the contractor was not obligated to purchase under the contract, he incurred no risk if he entered into such contracts with several manufacturers for cement for the same job. The purpose of the association and its members in collecting and disseminating information concerning the specific job contracts was to prevent contractors, in the event of a price increase, from taking advantage of such contracts by fraudulently purchasing

---

10. This compelling, controlling circumstance plaintiffs seek to brush aside by asserting that the Act does not require uniformity and that, when relying on the meeting competition defense, good faith "does not require exact price parity." What they are saying, from the comfort of a hindsight position, is that the defendants should have exercised less care and possibly have followed reckless policies in their compliance with Robinson-Patman. In the course of litigation it is at times expedient for one party to assert that the other parties took too seriously their obligation to comply with a statute, and that their compliance policies went beyond the required minimum. But that kind of argument, which plaintiffs make here, comes down to nothing more than the assertion that if plaintiffs had been running the defendants' business they would have elected to be less responsible in their compliance policies. The ultimate answer to the argument is that notwithstanding plaintiffs' speculative theorization of how defendants might have recast their Robinson-Patman policies, the evidence in these cases establishes without serious contradiction that the verification communications of the defendants were based on and geared to a good faith effort to comply with the Act.

The Supreme Court has held that a seller charged with price discrimination under Section 2(a) of the Robinson-Patman Act must show that it used diligence to verify its customer's claim of a competitor's lower price in order to avail itself of the good faith defense under Section 2(b) of the Act. Federal Trade Comm'n v. A. E. Staley Mfg. Co., 324 U.S. 746, 759–760, 65 S.Ct. 971, 89 L.Ed. 1338 (1945). Ever since *Staley*, American industry has been on notice that to avoid violating the Act a seller who knowingly discriminates among his customers must have substantial evidence which would lead a reasonable person to believe that the granting of a lower price would in fact meet the equally low price of a competitor. *See also*, Surprise Brassiere Co., Inc. v. F.T.C., 406 F.2d 711, 714–716 (5th Cir. 1969) and Viviano Macaroni Co. v. F.T.C., 411 F2d 255 (3rd Cir 1969). In the Third Circuit case the court clearly ruled that *Staley* required more than mere reliance upon unverified communications from customers or field personnel.

Following *Staley*, the Supreme Court in Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 241–242, 71 S.Ct. 240, 245, 95 L.Ed. 239 (1951) established the "meet but not beat rule." It held that the meeting competition defense of Section 2(b) of the Act " * * * is limited to a price reduction made to meet in good faith an equally low price of a competitor. * * * It also excludes reductions which undercut the 'lower price' of a competitor."

These decisions amply support the compliance policies of defendants and indicate that such policies where sound and necessary. The interpretations of the Act which plaintiffs propose in their suggested findings are not well founded in law.

the amount of cement required for a particular job from several manufacturers. (The similarity to the misuse of "job price protection" in the wallboard industry is quite apparent.)

The commitment between the cement manufacturers under which they jointly collected and distributed the price information relating to specific job contracts being conceded, the trial court rendered judgment in favor of the government. The Supreme Court reversed and with respect to the specific job contracts held that the communications between the association and its members for the prevention of fraud did not constitute an unlawful restraint on commerce, saying:

Unless the provisions in the contract are waived by the manufacturer, demand for and receipt of such deliveries by the contractor would be a fraud on the manufacturer, and in our view, the gathering and dissemination of information which will enable sellers to prevent the perpetration of fraud upon them, which information they are free to act upon or not as they choose, cannot be held to be an unlawful restraint upon commerce, even though in the ordinary course of business most sellers would act on the information and refuse to make deliveries for which they were not legally bound.

* * * [W]e cannot regard the procuring and dissemination of information which tends to prevent the procuring of fraudulent contracts or to prevent the fraudulent securing of deliveries of merchandise on the pretense that the seller is bound to deliver it by his contract, as an unlawful restraint of trade even though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned.

Nor, for the reasons stated, can we regard the gathering and reporting of information, *through the cooperation of the defendants* in this case, with reference to production, price of cement in actual closed specific job contracts and of transportation costs from chief points of production in the cement trade, as an unlawful restraint of commerce; *even though it be assumed that the result of the gathering and reporting of such information tends to bring about uniformity in price.*" (268 U.S. at 603–604, 45 S.Ct. at 591) (italics supplied).

From this language it is clear that in *Cement Manufacturers* the Supreme Court held lawful, and not in violation of the Sherman Act, an exchange between sellers of price information relating to specific customers, *even under circumstances amounting to an agreement,* where the purpose of the exchange was to safeguard against fraud and deception, and *even though prices might be affected thereby.* The "controlling circumstance" distinguishing *Cement Manufacturers* from *Container* was the *purpose* of the exchange of price information by the sellers. In *Cement Manufacturers* the purpose of the exchange was to protect against fraudulent misrepresentations by buyers. In *Container* there was no such justification by way of purpose, since the defendants did *not* seek to justify their exchange of price information as a means of protecting against fraud by buyers, compliance with the Robinson-Patman Act or any other similar lawful purpose.

Here, the "controlling circumstance" of *Cement Manufacturers* is present in abundance and relates not only the defendants' efforts to meet the requirements of the Robinson-Patman Act, but also to their efforts to avoid the consequences of fraudulent misrepresentations of buyers. The record is replete with evidence that the purpose of the verification communications of the wallboard producers was to permit compliance with the Robinson-Patman Act. The evidence also discloses that the verification communications served to protect defendants against the fraudulent practices of buyers. There is ample

evidence in the record that the buyers attempted to obtain lower wallboard prices from producers by misrepresenting the lower prices which they claimed to have been offered by competitors. The evidence also shows that customers attempted to obtain job price protection from several suppliers so that they might fraudulently procure excess quantities of wallboard at the protected price.

Even if there were no Robinson-Patman Act, the limited price verification of defendants would be completely within the *Cement Manufacturers* exception to *Container*. Here, unlike *Container*, defendants did not seek price information from their competitors "whenever [they] needed such information and whenever it was not available from another source" (393 U.S. at 335, 89 S.Ct. at 511). Rather, defendants here, as in *Cement Manufacturers*, were confronted with the problem of misrepresentation and fraud by the customer. *The wallboard producers verified with a competitor only after they received a report that a customer claimed a lower price and where the reliability of such claim was questionable.* Thus entirely apart from the Robinson-Patman Act and even if the Act did not exist, defendants would have been warranted in verifying prices to the extent they did under the circumstances existing in the gypsum wallboard market. The record demonstrates that many wallboard buyers, including dealers, misrepresented the price at which they could purchase wallboard from competing producers. These misrepresentations were simply attempts to obtain a lower price under false pretenses. Verification had the effect of exposing the lying buyer and preventing a fraud. This was precisely the purpose and effect of the arrangement between the producers in *Cement Manufacturers*.

No court is required by the Sherman Act to foster "competition" procured by fraud and misrepresentation, and the Sherman Act does not prohibit a defendant from protecting itself therefrom. That is "the controlling circumstance" of *Cement Manufacturers*. *Container* recognizes and approves that controlling circumstance.

*Container* appears to recognize the traditional Sherman Act criteria of purpose and effect as does also United States v. FMC Corporation, 306 F.Supp. 1106 (E.D.Pa.1969).[11] Judge Higginbotham did not hold in *FMC* that verification of a competitor's price in order to comply with the Robinson-Patman Act violated the Sherman Act. That issue was not presented. However, Judge Wollenberg of this district, faced that very issue in instructing the jury in Jones v. Shell Oil Co.[12] and held that a defendant who verifies a competitor's price with the competitor for the purpose of complying with the Robinson-Patman Act has not violated the Sherman Act.

It is the Court's conclusion that the verification communications of the defendants, practiced within the limitations above stated and having for their purpose compliance with the Robinson-Patman Act and protection against the fraud of buyers, come within the "exception to *Container*" and, hence, were not in violation of the Sherman Act.

*The Withdrawal of Price Exceptions Effective December 15, 1965.*

. There is no direct evidence in the record that defendants National or

---

11. A careful reading of the lengthy opinion in *FMC* will show that Judge Higginbotham found that these elements were present in the record before him: (1) an *agreement*, (2) for the *purpose* of stabilizing prices, and (3) with the *effect* of stabilizing prices. The information exchanges were not within the exception of *Container;* defendant FMC sought to justify them solely on the ground that the information exchanges permitted the manufacturers to set their prices in the light of full market information.

12. Northern District of California, Civil No. 47261, Transcript pp. 4472–73 (December 10, 1969).

Kaiser, or other major producers of gypsum wallboard actually knew in advance of USG's announcement of November 17, 1965 that effective December 15, 1965 it would withdraw all price exceptions and strictly adhere to published prices. While there is circumstantial evidence [13] from which one might infer that National had such advance notice, failure to establish such advance notice is not fatal to plaintiffs' claim that defendants were actively participating in an agreement or conspiracy to fix or stabilize prices. In an industry composed of few sellers of a homogeneous product, when the major competitive sellers engage in policies and practices which have for their objective the stopping of declining prices and deviations from terms of sale and when those policies and practices are parallel in detail (even as to unannounced policies and practices) and are so interdependent that adherence thereto on the part of *all* such major competitors is essential to the achievement of their objective, such interdependent conscious parallel action may well constitute a tacit understanding by "acquiescence * * * coupled with assistance" to effectuate a price fixing agreement.[14]

In Interstate Circuit v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1938), the Supreme Court said:

> As is usual in cases of alleged unlawful agreements in restraint of commerce, the government [here plaintiffs] is without the aid of direct testimony that the distributors entered into any agreement with each other to impose restrictions * * * In order to establish agreement it is compelled to rely on *inferences drawn from the course of conduct* of the alleged conspirators. (Italics supplied).

The course of conduct of the defendants in the instant cases involves more than mere "conscious parallelism." With relation to their December 15, 1965 withdrawal of price exceptions, a review of the course of conduct of the defendants reflects such "interdependent conscious parallelism" in their policies and practices (announced and unannounced) as to compel the conclusion that the defendants were engaged in a tacit understanding by "acquiescence coupled with assistance" to fix and stabilize the prices of gypsum wallboard.

To properly evaluate the course of conduct of the defendants, the Court must consider the factors which prompted USG to take the initiative, the factors which prompted the other defendants to follow USG's program, the nature of that

13. The circumstantial evidence that National and Kaiser knew of USG's contemplated action prior to its announcement of November 17, 1965 and that USG would not have made such announcement without prior acquiescence on the part of its major competitors upon which plaintiffs primarily rely consists of: (a) certain office memoranda of National identified as plaintiffs' exhibits 222, 223 and 224 (hereinafter referred to simply as 222, 223 or 224) which, because of the chronological sequence in which they were prepared and the nature of the corrections made therein, plaintiffs claim conclusively show that National had advance notice of USG's moves; (b) the testimony of Mr. Harper, of Kaiser, that at various times in 1965 he suggested to representatives of National and USG that they all should stop deviating from list (published) price; and (c) certain meetings of officers of defendant corporations,

which occurred prior to and at a time near to the date of the November 27, 1965 announcement of USG. With relation to Mr. Harper's suggestions, he further testified that he received no reaction thereto. As to the meetings of officers of defendant corporations, it was never established that price or any policy relating to price was discussed at these meetings. The more difficult problem arises as to the manner in which 222, 223 and 224 are to be interpreted and the inferences to be drawn therefrom. These exhibits will be hereinafter discussed.

14. "Whether the conspiracy was achieved by agreement, by tacit understanding, or by 'acquiescence * * * coupled with assistance in effectuating its purpose is immaterial.'" United States v. Singer Mfg. Co., 374 U.S. 174, 193, 83 S.Ct. 1773, 1783, 10 L.Ed.2d 823 (1962).

program, the manner and degree to which USG's competitors followed its program and the period over which it was followed.

By mid-1965 the realized prices (mill nets) of gypsum wallboard were lower than at any time since the mid-1950's. Each defendant experienced sharp declines in its mill nets in the period preceding the December 15, 1965 price change. The average mill net for all gypsum wallboard producers also declined sharply during 1965 and the several preceding years. The period of 1964–65 was a time of price cutting by the gypsum wallboard producers. One of the reasons for the continued decline in prices was that multi-plant producers of gypsum wallboard, including defendants, at times met the lower prices of single plant producers. Single plant producers were usually unable to sell their wallboard at the same price as the multi-plant producers because they did not have available for the customer the same technical assistance, management programs, services or product line that were available from the multi-plant producers. As a result, the single plant producers followed much the same pattern that exists in other industries of obtaining business by selling at a price lower than the multi-plant producers. When multi-plant producers met the lower price of the single plant producers, the latter would again lower their prices. When these lower prices were in turn met, the downward spiral continued.

Recognizing that these increasing competitive pressures on their pricing structure, industry position and profit levels called for corrective action, in *the spring* of 1965 USG decided to change its policy of "defensive pricing"—meeting competition only as it was found and not exceeding it—by adopting a pricing policy with the following features: (1) withdraw "PA's" (price adjustment, [price deviation] to meet competition) and republish prices at levels which more realistically existed in the market with the hope that pricing would then stabilize; (2) decentralize pricing authority and limit PA's to five per cent off-list for volume purchasers; and (3) extend the zone pricing system throughout the remainder of the country. In adopting this plan, USG considered the reactions of their competitors and concluded, from what they could see of their earnings, that they also were suffering. USG therefore expected that they would follow USG's pricing action. In fact this proved to be an incorrect expectation and prices continued to deteriorate during the summer of 1965. Instead of limiting the five per cent to volume purchasers, competition elected to extend the lower price to all accounts. The failure of USG's competition to follow this lead should not be ignored in the Court's consideration of the action taken by USG later in that year.

By *mid-September*, 1965, it had become apparent that competition had not followed USG in this particular effort to stabilize pricing; on the contrary, prices were deteriorating more rapidly than ever. USG's realized price on ½ inch wallboard had dropped from $40.66 MSF in 1964 to an estimated $34.94 in September, 1965 and a further reduction to $33.23 by December, 1965 was anticipated. The decline in ⅝ inch fire rated wallboard was even more pronounced, going from $57.46 MSF for 1964 to $50.91 for July, 1965, followed by a further decline for the rest of the year. By this time USG was selling below its list price to 38 per cent of its dealers in order to meet lower competitive prices and was concerned about the risk of being charged with unlawful discriminatory pricing. By *early October* it was generally recognized by USG's management that something must be done or in 1966 USG would suffer a further deterioration in prices and a loss in gross profit approximately equal to that expected for 1965. This loss in gross profit was calculated to be approximately $18,000,000 below 1965 and $29,000,000 below 1964. To meet this unfortunate economic turn of its business, which also carried with it a decline in USG's share of the market, the Marketing Group of USG began a

series of meetings and discussions to study the pricing situation in order to submit a plan of possible future action to top management. It was suggested that effective January 1, 1966, USG should announce new zone prices, withdraw all discounts, and announce that the new prices were firm and subject to no discounts.

Prior to October 25, 1965, a document entitled "Review of Price Strategy" was prepared and read at a meeting of USG's top executives—Mr. Morgan, Mr. Shaver, Mr. Watt, Mr. Gimlin, Mr. Duffy, Mr. Busch and USG's attorney, Mr. Price. The "Review of Price Strategy" expressed the conclusion that:

> Something must be done to reverse this serious loss in earnings. Any upward price move based upon the present confused pricing structure of discounts, concessions and allowances is doomed to failure. "Major surgery", seems the only course to provide the healthy condition on which to build for the future.

The document then suggested the following proposal:

1. Accept the principle that we will *not* meet the price competition of single plant producers, namely:

| | | |
|---|---|---|
| Dierks | Temple | Grand Rapids Gypsum |
| American | Republic | Ruberoid |

2. Revise present policy of extending discounts and concessions to meet competition and establish a policy of selling only at published zone prices—no defections of any type.

3. Withdraw *all* discounts and defections effective January 1, 1966.

4. Establish our selling prices at presently published zone levels except for increases involving the States of Texas, Oklahoma, New Mexico, Colorado, Wyoming, Montana, Arkansas and Louisiana wherein deterioration has been so severe as to necessitate restoration to a more normal level.

5. There will be no delegation of authority to make pricing decisions; rather, administration of price will be concentrated in one person.

HOW IT WORKS

Our new policy will be announced November 11th to the Wall Street Journal [15] and letters to the trade will be mailed on that date. * * *

> No price protection will be given to dealers and, generally, a "no protection" policy will be adopted. However, to avoid hardships and deep seated ill will from customers who face significant losses on firm price and wherein the Company has some legal and/or moral involvement, protection on jobs will be judiciously considered and granted. A list of commitments to include price and estimated quantity will be compiled and made available to competitors in Chicago by December 15.

In summary the recommendations in this document had the following features which are of principal importance: (a) withdraw all discounts effective January 1, 1966; (b) adopt a policy of selling only at list prices; (c) announce the above to the Wall Street Journal and through

15. Prior to USG's November 27th announcement to the trade, Mr. Morgan or Mr. Shaver of USG elected to dispense with the suggested announcement to the Wall Street Journal. Plaintiffs contend that the decision of USG to dispense with the Wall Street Journal announcement means that it was no longer necessary to inform its competitors of USG's action because a conspiracy had been formed. They reason that the purpose of the announcement was to inform competitors of USG's action as rapidly as possible because the success of USG's policy depend-ed on parallel action on the part of major competitors. Selling only at list prices and ignoring the competition could never have worked if National or Kaiser had not adopted a similar policy. While this may be a plausible explanation of the reason behind USG's withdrawal of the Wall Street Journal announcement, it strikes the Court as being too speculative to be given weight as affirmative proof. Hence this added factor, as proof of a conspiracy, forms no part of the conclusions of the Court herein reached.

letters to the trade on November 11, 1965; (d) ignore the competition of single plant producers; (e) centralize pricing authority with no delegation of this authority; and (f) compile a list of job commitments to include price and estimated quantity to be made available to competitors in Chicago by December 15, 1965.

The author of the "Review of Price Strategy" attempted to point out the possible effect this proposal might have on USG's sales as a result of the reaction of USG's customers and competitors. With regard to the customers it was suggested that as a result of USG's initial announcement withdrawing all exceptions "[a] very adverse reaction is anticipated from large volume customers with substantial initial loss in business." This loss was estimated to be on the order of $8.8 million. With regard to the reaction of USG's competitors it was estimated that if the major competitors similarly withdrew all discounts and sold only at list prices, the additional gross profit realized as a result of the price improvement (or more accurately the savings from further price erosion) would equal $10.6 million, more than enough to compensate for the gross profit lost from adverse customer reaction. On the other hand, it was pointed out, "there is an inherent risk that we could lose both position and price improvement." If USG's major competitors did not similarly withdraw all discounts and thereafter sell only at list prices, USG would lose not only the $10.6 million in anticipated price improvement but also $8.8 million as a result of adverse customer reaction from USG's announcement. The USG witnesses unanimously testified that the success of the new pricing policy was *dependent on the other major competitors following suit.* As Mr. Watt said, the great danger of this announcement was "the possibility that the other producers would go right on making or meeting lower prices."

Between October 25, 1965 and November 9, 1965 numerous drafts were prepared of various documents written as part of USG's new policy, and numerous meetings were held to discuss the details of the new policy. In the course of redrafting and publishing USG's new policy, one factor that becomes important is the fact that Mr. Morgan, the Chief Executive Officer of USG, expected to release USG's announcement on November 15, 1965. This is an important factor because, as will hereinafter appear, it explains the time schedule set forth in National's "Plan of Action" (Plaintiffs' Exhibit 222).

Thereafter on or shortly before November 15, 1965, USG changed the date of announcement to reflect in its final draft an announcement date of November 17, 1965. This announcement read in part as follows:

Any discounts of gypsum board and/or plaster products previously extended to meet competition will be withdrawn as of December 15, 1965.

\* \* \*

As a constructive move, we have decided to sell our gypsum products solely on the basis of our published prices.

Attached to each USG announcement was a price list for the particular price zone in which the customer was located. The evidence indicates that the announcement was in fact mailed on November 17, 1965. There was no announcement to the Wall Street Journal nor was there any public announcement of two features of USG's plan—*(1) that USG would ignore the competition of single plant producers, and (2) that pricing authority would be centralized in one person with no delegation of this authority.* These two important features of USG's plan were meticulously followed in such like detail by National, Kaiser and Flintkote as to convince the Court that they were interdependent parallel actions executed pursuant to at least a tacit understanding of acquiescence and assistance to fix and stabilize the price of gypsum wallboard. In an oligopolistic industry marketing a homogeneous product in which the greatest competition comes from single plant producers, it is difficult to en-

vision how the independent business interests of a major seller of such product can be served by refusing to meet such competition, unless there is a clear understanding by acquiescence on the part of all major sellers to refuse to meet such competition. USG's unannounced policy not to meet the price competition of Dierks, American Temple, Republic, Grand Rapids Gypsum and Ruberoid (established prior to October 25, 1965 and continued intact in all succeeding drafts of USG's price review) could have no meaningful economic effect without the interdependent assistance that would come from National's, Kaiser's and Flintkote's acquiescence in and adherence to an identical program. The economic importance of the single plant producer was expressed by Mr. Morgan, President of USG, who testified that in his opinion, "the single plant producers were one of the principal reasons that there was this decline in the price level that existed, starting, let us say, in the early 60's." Despite the economic importance of the single plant producer and despite the fact that USG made no announcement that it would not meet the price competition of such single plan producers, the evidence reveals that Kaiser, National and Flintkote refused to meet the competition of single plant producers subsequent to December 15, 1965. Mr. Atwell, of National, testified that the District Managers had been instructed that henceforth National was going to hold its price and that they shouldn't pay any attention to minor competitors. The District Managers received the impression that they were not then to report price deviations of minor competitors and, for some period of time until Mr. Atwell notified them otherwise, this apparently was the situation. Similarly, Mr. Hague, of Kaiser, testified that while they received reports of competition from American Gypsum Company subsequent to December 15, 1965, and while prior to December 15, 1965 they had met American's competition, thereafter for over a year they ignored the competition. Month after month after December 15, 1965, Mr.

Seitz of Flintkote reported to his superiors that American Gypsum was cutting the price of wallboard, causing Flintkote to lose business. Yet month after month Flintkote remained adamant and refused to meet this competition.

This position of tolerance toward the single plant producers could only work if all major producers had a similar policy. It was clear that the moment one major producer started to meet the competition of a single plant producer the entire price structure would come tumbling down. As already indicated, the defendants regarded the single plant producers as vigorous competitors. Verification with them was difficult. They were often aggressive in selling at off-list prices. While the defendants could not get the single plant producers to agree to stop offering discounts and similar special deals, they could do the next best thing by keeping their own prices high. Each of the defendants, in adopting a policy of price tolerance for single plant producers, was following a course of action completely dependent upon parallel action by its competitors. As long as all the major producers held the line and ignored the single plant producer, the snowballing effect of one major producer meeting a single plant producer, and in turn being met by another major producer, and yet another major producer, could be avoided.

The other significant unannounced feature of USG's program, which was followed by the other defendants was its policy that "there will be no delegation of authority to make pricing deviations; rather, administration of price will be concentrated in one person." In policy, this complete centralization of pricing authority, was entrusted to Mr. Morgan, USG's Chief Executive Officer, and Mr. Watt, its Vice-President of Marketing. Prior to December 15, 1965, this authority to authorize off-list prices had been delegated to Mr. Gimlin, Mr. Lane, Mr. Watt and Mr. Underwood. National similarly centralized all pricing authority in its Chief Executive Officer, Mr. Colon Brown. Prior to December 15, 1965, au-

thority to grant price exceptions for National had been delegated to Mr. Gustavus, Mr. Nicely, Mr. Atwell, Mr. Hildinger and Mr. Cerrutti. At the same time that USG and National centralized pricing authority, Kaiser made the same move and centralized all pricing authority in Mr. Harper, its Chief Executive Officer. Mr. Hague testified that he was informed by Mr. Harper that there would be no changes from list price without Harper's approval. Prior to December 15, 1965, both Mr. Hague and Mr. Costa had authority to approve off-list prices. Mr. Hague testified that the discussions concerning the centralization of pricing authority did not occur until after they received USG's announcement. However, there was nothing in USG's announcement that would suggest the centralization of pricing authority.

The act of centralizing all pricing authority in the Chief Executive Officer of each defendant corporation was necessary for control purposes, and it was only if each of the major producers was able to control its sales organization (which was volume oriented and wanted to sell all it could by being competitive) and guarantee that there would be no meeting of competition from single plant producers that the new plan for price stability would work.

National, having learned of USG's new policies and practices, whether or not learned in advance as claimed by plaintiffs, and having been assured by a letter from USG (registering and listing its job protection commitment) [16] that it would stand firm on its new prices and sell only at list price, proceeded to put into effect an identical program, the unannounced part of which, as it relates to tolerance of single plant producers and centralization of pricing authority the Court has just reviewed.

National's complete embracement of USG's program is evidenced by three undated, separate drafts of National's "Plan of Action," which came from its files and constitute plaintiffs' exhibits 222, 223 and 224. Those exhibits, photostatic copies of which are attached as an appendix hereto, satisfy this Court that in chronological sequence, 222 was prepared first, 223 next and 224 last. No.

16. At the time USG announced its withdrawal of pricing exceptions effective December 15, 1965, it sent out 12 identical letters, one to each of its competitors which read as follows:

Recently we made an announcement to the trade with respect to prices to be charged for our gypsum products effective December 15, 1965, which you probably have learned about from the trade.

No mention was made in our announcement regarding honoring of commitments made prior to the announcement. We have certain moral and legal commitments which we have decided we must fulfill.

A copy of our policy with regard to commitments is set out in our November 17th letter to our sales organization, a copy of which is enclosed. We intend to list all of our commitment with our auditors, Arthur Andersen & Company, and to record all shipments against job commitments. If you desire to confirm whether or not we have a commitment with respect to any specific job or a commitment for a specific number of units, or for a specific period of time, you are at liberty to contact Mr. Warren Cecil of Arthur Andersen & Company's Chicago office. If there is any other pertinent information that you wish with respect to such commitments, we will answer your questions.

We make this information available to you because it is common knowledge in our industry that it has become practically impossible to secure in the field accurate knowledge of the prices and policies of competitors, and that all of of us have been frequently misled by misrepresentation of customers and users of our products. In view of this situation, we are willing that you should have knowledge of our business commitments which were made prior to our November 17, 1965, price announcement to the trade.

While the use of such a registry of USG's job commitments, alone, might not constitute an antitrust violation, it nevertheless served as a means of removing all doubts as to the exact position of USG not to cheat on its announcement to sell only at list price.

222 carries certain corrections in the handwriting of Mr. Atwell of National. The very nature of the corrections made on the face of 222: a change in date in item 4 from "Nov. 18" to "Nov. 19"; a change in item 7, wherein were added the words "together with a copy of Company Policy to entire sales force"; a change in item 8, wherein after the opening word "Letter" was added "and new zone price lists"; and the elimination of item 9, the substance of which appears in the added words in item 7; clearly establish that 222 was prepared first and that 223 and 224 followed. The revised date in item 8 of 223, wherein the date December 18th was changed by a handwritten cancellation of "18th" by drawing a line therethrough and a handwritten substitution by writing underneath the figure "14", which revised date appears in typewritten form in 224, shows that 223 was prepared before 224.

The first point to be noted from the "Plan of Action" is that the language used and a reading of the documents as a whole suggest that future action was contemplated. The word "Procure" is a command for future action, namely, that the designated acts are to be performed in the future. When used in proximity with the date of November 17, it should be reasonably interpreted to mean that National was to obtain a copy of USG's dealer letter and sales force letter on November 17—a future event. The logical inference is that the first "Plan of Action" (222) was written prior to November 17, 1965. The document having been written prior to November 17, 1965, the Court concludes that National had prior notice of USG's November 17 announcement.

The second point to be noted from the "Plan of Action" is that as of the date it was first written, National had decided to adopt a policy similar to that of USG and sell only at list prices.

The first "Plan of Action" refers to a "new company policy" under item 9 of the timetable. This item states that on November 24, a letter be sent to the Region, Division and District Managers "detailing new company policy together with new zone price list" (222). Item 9 was stricken from later drafts of the "Plan of Action" (223 and 224) and its substance incorporated in the changes in item No. 7 (handwritten in 222 and typewritten in 223 and 224). That the reference to a "new company policy" meant a policy of selling only at list prices is made clear by four other documents, introduced in evidence, which were early drafts of National's letters to its customers and sales personnel (Plaintiffs' Exhibits 229A, 229B, 230 and 273). On these drafts the date of the announcement is either left blank or omitted, thus indicating that the November 24 date for the mailing of National's announcement had not yet been determined. The first "Plan of Action" on the other hand discloses that it had been determined that National would publish its new prices and policy on November 24. One may therefore reasonably infer that the draft letters were written prior to the first "Plan of Action." These draft letters show that National was to announce not only new zone prices, but also a new policy of selling only at list prices.

A third point to be noted from the "Plan of Action" is that the time schedule for the various tasks, that had to be completed in order to have National's announcement in the mail by the 24th of November, could only have been performed if USG had mailed its announcements on November 15—the date originally comtemplated.

The schedule set forth in the first "Plan of Action" contemplated that USG's announcement would be sent on November 15 and, accounting for mailing time,[17] it was anticipated that by No-

---

17. While some USG witnesses testified that certain customers were to receive hand delivery of the USG announcement, National presumably had no way of knowing this and whoever wrote the "Plan of Action" would be expected to assume mail delivery.

vember 17 National would obtain USG's letters to the dealers and sales force. By the 19th National would procure a complete set of price lists for all zones. On the 18th (later changed to the 19th), Mr. Nicely was to wire to all Regional, Division and District Managers a copy of USG's initial dealer letter, and by the 24th National's letters were to be in the field announcing National's prices and new policy.

This schedule was completely thrown off by virtue of USG postponing the date of its announcement from November 15 to November 17. Since November 17 was a Wednesday, National had only four working days to meet the November 24 deadline. Regardless of whether the call from National's Midwest Divisional Manager in Chicago, Mr. Wright, was on the 17th or the 18th; so far as the evidence discloses, this call was National's first confirmation that USG's announcement had been released. Mr. Wright did not mail his copy of USG's announcement to Buffalo until the afternoon of the 18th. Even though it was sent air mail special delivery and was stamped "received" in Buffalo, New York on the 19th, National's schedule was already two days off.

The "Plan of Action" also called for Mr. Nicely to send a telegram to the Field Managers, reciting USG's announcement, on November 18. However, he needed a copy of the announcement before he could telegraph its contents. Mr. Nicely did not receive Mr. Wright's copy of the USG announcement until November 19 and therefore his telegram to the Field Managers reciting USG's announcement which had "just been picked up in the field" was not sent until November 19, one day later than the schedule in the first "Plan of Action" (222).

Nor was it possible to secure all of USG's price lists for all zones by the 19th. Mt. Atwell testified that even though he called someone at USG and requested a complete set of USG's price sheets, the complete set was not in his office until Monday morning, November 22, when he came to work.

All this evidence leads to the conclusion that National had advance notice of USG's action; had agreed to follow a similar policy; and was thus engaged in a per se illegal combination and conspiracy in violation of Section 1 of the Sherman Act. However, even if the evidence is not convincing as to National's advance knowledge of USG's contemplated action, there can be no doubt that at least a tacit understanding of acquiescence and assistance existed between National and USG to fix and stabilize the price of gypsum wallboard.

Proof of the complete nature of National's embracement of USG's program is further evidenced by the fact that Mr. Atwell, in the discharge of his responsibility to prepare new list prices for the various zones at a competitive level with USG, called someone at USG and requested that they send him a complete set of USG's price bulletins. Mr. Atwell testified that these documents had been received by the time he arrived at his office on the morning of November 22, 1965. A review of these documents from USG and the work set of National's price sheets reveals that Mr. Atwell's staff, with meticulous care, prepared a set of new National price bulletins which when published was the substantial equivalent of the USG price bulletins.

That Kaiser was a willing participant in the conspiracy is also clear from the evidence.

> It has been held that once a conspiracy is proved a relatively small amount of evidence connecting a particular defendant with that conspiracy will suffice to sustain a guilty verdict. Considering the above together with the evidence that Deseret Salt continued its predecessor's policy of nondeviation from the prices of the others and that it apparently participated in the exchange of pricing information, there is enough to connect Deseret Salt to the conspiracy. Morton Salt Co. v. United States, 235 F.2d 573, 580 (10th Circuit 1956) (footnote omitted).

As Judge Higginbotham said in United States v. FMC Corp., 306 F.Supp. 1106, 1151 (E.D.Pa.1969):

> It is not relevant that there is no evidence to link FMC to every facet of the conspiracy; nor can FMC successfully argue that it is not bound by acts done pursuant to conspiracy before the evidence established its participation. The conspiracy was reflected in a *continuing* agreement, and as such renders FMC liable for all acts done pursuant to the agreement. Esco Corporation v. United States, *supra,* 340 F.2d p. 1006; Morton Salt Co. v. United States, *supra,* 235 F.2d p. 580.

Plaintiffs rest their claim that Kaiser had advance notice of USG's moves upon speculative and inconclusive inferences drawn from various discussions among Kaiser's officers relative to Kaiser's withdrawal of all price exceptions and credit exceptions[18] and the manner in which Mr. Hague informed his sales force of Kaiser's new policy. Though these plausible but speculative inferences have no probative value, the fact remains that prior to USG's announcement and in 1965 Mr. Harper, the Chief Executive Officer of Kaiser, had solicited USG and National to stop deviating from list price. This is a fact of major significance, which, when coupled with the complete manner in which Kaiser too embraced USG's program,[19] leads to the conclusion that Kaiser was acting in concert with USG and National. Despite the fact that Mr. Harper said that he had received no reaction to his solicitation (an invitation to USG and National for an agreement to withdraw off-list prices), it should be obvious that USG and National, upon hearing Mr. Harper's comment, would feel confident that any joint action they took would be followed by Kaiser. As a matter of law this is sufficient to tie Kaiser to the conspiracy.

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was

---

18. The reason Kaiser did not include credit in its November 30, 1965 announcement was "because there was so much out there that it was too quick. We didn't have the time."

19. The only element of USG's program that neither Kaiser, National nor Flintkote followed was the creation of a job commitment register for their respective companies. Nor did they avail themselves of the register at Arthur Andersen. No witness was able to adequately explain this commitment register as a necessary means of information exchange. The information on the register included the name of the job, the quantity of wallboard committed and the length of the commitment. If a competitor wanted to know if a job was protected, all he had to do was call up and ask, since job protection was a subject of verification. There was no reason to call Arthur Andersen for this information. When questioned as to why, since they had the procedure of verification, they needed Arthur Andersen, Mr. Morgan said he did not recall. Even if a competitor wanted to verify a price on a protected job he could not call Arthur Andersen because Arthur Andersen did not have price information; however, he could call USG to verify the price. In fact the letters sent to USG's competitors invited them to call: "If there is any other pertinent information that you wish with respect to such commitments, we will answer your questions."

Mr. Watt stated that a purpose of the commitment register was to police a job to make sure a committed job was not overshipped with the product going somewhere else. However, Mr. Evans said they did not need to place the commitment register with Arthur Andersen to keep track of the quantity shipped and Mr. Harper testified that at Kaiser, the salesmen policed a protected job by going out to the job and seeing how much is shipped on the job.

It is therefore apparent that the Arthur Andersen commitment register and USG's letters to its competitors served no purpose of significance in the industry, except (1) to assure USG's competitors that it was going to hold to its promise, and (2) to solicit other competitors to adopt a similar policy.

essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, which, we will presently point out, was unreasonable within the meaning of the Sherman Act, and knowing it, all participated in the plan. The evidence is persuasive that each distributor early became aware that the others had joined. With that knowledge they renewed the arrangement and carried it into effect for the two successive years.

It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. * * * Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226–227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939) (citations omitted).

See also United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Thus, when Mr. Harper suggested to his competitors that they cease granting off-list prices he was effectively conveying his offer to participate in a plan to withdraw discounts and fix prices at list. An exchange of words is not required. Frey & Son v. Cudahy Packing Co., 256 U.S. 208, 216, 41 S.Ct. 451, 65 L.Ed. 892 (1921).

Written assurances it concedes, are unnecessary. So are oral assurances, if a course of conduct, or a price schedule, once suggested or outlined by a competitor in the presence of other competitors, is followed by all—generally and customarily—and continuously for all practical purposes, even though there be slight variations. Esco Corp. v. United States, 340 F.2d 1000, 1008 (9th Cir. 1965).

Kaiser's announcement of November 30, 1965 that effective December 15, 1965 it would withdraw all price exceptions, together with Mr. Harper's prior solicitation that USG and National do so, and Kaiser's adherence to USG's unannounced policies not to compete with single plant producers and to centralize all pricing authority in the Chief Executive Officer, lead to the conclusion that Kaiser was party to a conspiracy to fix prices, achieved, if not by specific agreement, at least pursuant to a tacit understanding, "by acquiescene * * * coupled with assistance in effectuating its purpose."

The chronological order in which the major producers announced their withdrawal of deviations from published prices effective December 15, 1965 was as follows:

| | |
|---|---|
| USG | November 17 |
| Georgia-Pacific | November 24 |
| National | November 24 |
| Blue Diamond | November 29 |
| Flintkote | November 30 |
| Kaiser | November 30 |
| Celotex | December 1 |
| Fibreboard | December 2 |

*The Withdrawal of Extended Terms Exceptions, Effective March 1, 1966.*

When USG announced its intention, effective March 1, 1966, to withdraw any exceptions to terms of sale, the other major producers followed its lead as hereinafter set forth. The chronological order in which the major producers announced their withdrawal of extended terms exceptions effective March 1, 1966 was as follows:

| | |
|---|---|
| USG | January 26 |
| National | February 1 |
| Kaiser | February 7 |
| Georgia Pacific | February 7 |
| Flintkote | February 7 |
| Fibreboard | February 14 |
| Celotex | February 16 |

On January 26, 1966, USG announced to its customers that effective March 1, 1966, "Any exception to terms of sale to meet more favorable terms of compe-

tition are hereby withdrawn effective with March shipments." The new terms were 2 per cent the 20th of the month following shipment; net 10th of the second month following the month of shipment: "The practice of allowing cash discount in second month following shipment for invoiced dated toward the end of the month and/or the practice of allowing the arrival date of shipments as the basis for beginning the discount period will be discontinued effective March 1st. Thereafter all shipments made in any month will be billed as that month's shipments."

On February 1, 1966 National announced to its customers that effective March 1, 1966 the terms of sale would be 2 per cent the 20th of the month following shipment; net 10th of the second month following the month of shipment: "At the same time, we will discontinue the practice of a 'cutoff' date prior to the month end, and the practice of using arrival date of shipments to determine discount payment date. All shipments made during a calendar month —from the first through the last day of the month—are eligible to earn cash discount when paid by the 20th of the month following shipment." The announcement further stated that "No exceptions to the above terms will be allowed."

On February 7, 1966 Kaiser announced that effective March 1, 1966 its terms of sale would be 2 per cent the 20th of the month following shipment; net 15th of the second month following the month of shipment. The announcement stated: "Shipments made at any time during any calendar month will be billed as that month's shipments and must be paid by the 20th of the following month if the cash discount is to be earned. Regional

practices of using the arrival date to compute the cash discount period are discontinued. No exceptions will be made to these terms of sale."

On February 7, 1966 Flintkote also announced that effective March 1, 1966, its terms of sale would be 2 per cent the 20th of the month following shipment; net 10th of the second month following the month of shipment: "Effective March 1, 1966, shipments made in any month will be invoiced as that month's shipments and subject to our March 1, 1966, revised terms." On February 14, 1966 Fibreboard announced the same terms.

Prior to these announcements, extended credit terms had become a frequently used competitive practice. As such it was an additional means of lowering the price to get a particular customer's business, and was a loophole in the December 15 policy of selling only at list prices. The extension of terms had the effect of deferring payment and thereby providing working capital to the dealers. Also, extending the time within which the 2 per cent discount could be earned resulted in an important price concession.

To fill this loophole in the December 15 policy of selling only at list price the major producers reacted in the manner above described, and though there is no evidence that there was any actual communication among the defendants before January 26, 1966, when USG announced its withdrawal of exceptions to terms of sale effective March 1, 1966,[20] it is reasonable to infer from the identity of action taken by the defendants, the timing thereof, and the manner in which they were faithfully adhering to their December 15 program, that the further

---

**20.** Plaintiffs contend that when the Federal Trade Commission on October 14, 1965, issued its order terminating the proceedings initiated by the Industry's Trade Practice Committee without the issuance of Trade Practice Rules, the "raison d'etre" of the Industry's Trade Practice Committee ceased and that the meeting of that Committee convened by

Mr. Harper of Kaiser at Chicago, Illinois on January 3 and 4, 1966, and attended by representatives of USG, National, Celotex and Bestwall, had for its true objective an agreement to withdraw exceptions to terms of sale. This contention, however, is purely speculative and has no substantial evidentiary support in the record.

identical steps taken by each of the defendants to withdraw extended terms exceptions was a reaffirmation, extension and tightening of the December 15 arrangement.

At all events, even if this should not be deemed a reasonable inference, the combination and conspiracy to stabilize prices was already in full force and effect and the absence of this added means of effecting or strengthening the conspiracy will not save the defendant producers from the consequences thereof and the civil liabilities in favor of plaintiffs flowing therefrom.

*Pricing Stability Achieved After December 15, 1965.*

The pricing stability achieved subsequent to December 15, 1965 was inconsistent with the economic situation facing the industry at that time. Prior to December 15, 1965, the steadily declining ratio of demand to capacity was particularly evident in the pattern of declining prices. This is as one would expect. With excess capacity the temptation to cut prices for volume would result in an overall lowering of prices. In the period subsequent to December 15, the imbalance between supply and demand in the gypsum industry became even more acute. Consumption of wallboard was lower in every quarter of 1966 than it had been in the equivalent 1965 periods, and at the same time new gypsum facilities that had been started in previous years were completed. The ratio of demand to capacity was worse in 1966 than it had been at any other time in the preceding years.

Despite this excess capacity, the United States Department of Commerce, Bureau of Labor Statistics, price index for wholesale prices of gypsum wallboard increased throughout 1966. Not only were price and credit concessions withdrawn but also price increases were instituted on December 15, 1965 and at various times in 1966. On June 24, 1966, John Brown, the Senior Vice President for Sales of National, was able to report that "price structures were holding despite lower residential housing starts," and Mr. Watt of USG testified that in 1966 while industry wallboard sales dropped 12 per cent and USG's sales dropped 17 per cent, realized prices for wallboard increased 5 per cent. Such a situation can hardly be said to represent the typical picture of prices resulting from the normal and unfettered interplay of supply and demand. It reflects the intended and anticipated results of defendants' conspiracy.

a. *Impact*

As noted earlier above, the plaintiffs in these actions were six specialty wallboard dealers. Two of the plaintiffs were original building materials supply dealers who in the late 1950's and early 1960's evolved into specialty wallboard dealers. The other four were formed in the early 1960's as specialty wallboard dealers. All six of the plaintiffs purchased substantial gypsum wallboard from each of the defendants USG, Kaiser and National, as well as other producers of wallboard. Their purchases of ½ inch regular and ⅝ inch fire-rated wallboard exceeded $20 million. The prices paid and the terms and conditions of sale received by these plaintiffs were directly affected by the stabilization conspiracy referred to in the foregoing findings and conclusions of this Court and resulted in direct impact on these plaintiffs. The amount of damages sustained by each of these plaintiffs during the existence of that conspiracy remains to be determined at the further trial of these cases.

b. *Duration of the Conspiracy.*

The December 15, 1965, effective date for the withdrawal of price deviations, the ignoring of competition from single plant producers and the centralization of pricing authority in one person, the Chief Executive Officer of each defendant corporation, clearly marks the beginning date of the conspiracy. Greater difficulty is encountered in fixing the termination date thereof. USG, with two exceptions (sales to Wickes, its largest customer and to National Homes, another of its largest customers), generally

adhered to its list prices during 1966 and 1967. National, with but one significant exception, adhered to its announced policy to sell only at list prices until early 1968. Kaiser, with some exceptions made early in 1967 and in mid-1967, the latter, a price deviation made in California to meet a competitive price offered one of its major San Francisco dealers, generally adhered to its list prices during 1966 and 1967. From this evidence it is reasonable to conclude that by January 1, 1968 all defendants had effectively abandoned and withdrawn from the conspiracy. The Court, therefore, fixes the duration of the conspiracy to be from December 15, 1965 to January 1, 1968.

*Conclusion.*

From the foregoing the Court concludes:

1. That it has jurisdiction over the parties and the subject matter of these actions;

2. That the joint efforts of USG, National and Kaiser to procure trade practice rules from the Federal Trade Commission, referred to in footnote 2 above, regardless of their intent or purpose, did not violate Section 1 of the Sherman Act, 15 U.S.C. Sec. 1;

■ 3. That the price verification practices of the defendants prior to December 15, 1965, though pursuant to understanding among the defendants, were legitimate practices in furtherance of their obligations to adhere to the requirements of the Robinson-Patman Act and their right to protect themselves against the fraudulent misrepresentations of buyers, and hence, not in violation of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1;

■ 4. That during the period from December 15, 1965 until January 1, 1968, USG, National and Kaiser combined and conspired among themselves and with others, to stabilize and maintain the price level of gypsum wallboard through a course of interdependent conscious parallel action pursuant to a tacit understanding by acquiescence coupled with assistance whereby they mutually agreed to, and did in fact, effective December 15, 1965, withdraw all deviations from list or published prices of gypsum wallboard, ignore the competition of single plant producers and centralize all pricing authority in the Chief Executive Officer, and whereby, effective March 1, 1966, they mutually agreed to, and did in fact, withdraw extended terms of credit (extended cash discount terms) from all buyers of gypsum wallboard;

5. That the combination and conspiracy described in conclusion 4 hereinabove continued in full force and effect from December 15, 1965 to January 1, 1968;

6. That in effectuating the combination and conspiracy described in conclusion 4 hereinabove the defendants did in substantial measure succeed in stabilizing the price of gypsum wallboard, particularly during the year 1966;

7. That the combination and conspiracy described in conclusion 4 hereinabove constituted an unreasonable restraint of interstate trade and commerce in gypsum wallboard in violation of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1;

8. That as a proximate result of the violation described in conclusions 4 through 6 hereinabove, there was direct impact upon the plaintiffs, each of whom suffered damage to their respective businesses and property in an as yet undetermined amount.

Plaintiffs are directed to prepare a partial judgment in accordance with the foregoing opinion and footnotes, which constitute the Court's findings and conclusions of law, as required by Fed.R. Civ.P. 52(a).

The parties to these cases are directed to appear before this Court, courtroom No. 2, at 1:30 p. m. on April 8, 1971, for further pretrial to provide for the completion of discovery on the issue of damages and the fixing of a trial date to determine the damages due plaintiffs and/or any other appropriate termination of this litigation.

# APPENDIX

### EXHIBIT 222
PLAN OF ACTION

NOV. 17th   -   1.   Procure USG letter to dealer

NOV. 17th   -   2.   Procure USG letter to Sales Force

NOV. 19th   -   3.   Procure USG price list for all zones

NOV. 19th   -   4.   Initial USG dealer letter to be wired by Nicely
to all Region, Division and District Managers

NOV. 19th   -   5.   Each Region Manager to contact their respective
Division Managers by phone to discuss contents
of teletype message and the need for our Sales
Force to start soliciting additional business
at present prices.

NOV. 19-20   -   6.   Division Manager to contact all District Managers
to discuss contents of teletype and the need for
soliciting additional business at present prices.

NOV. 24th   -   7.   Atwell responsible for the preparation of new price
lists by zones to make us competitive to be mailed
no later than November 24th to all Company internal
departments, field Sales offices, Plant offices and
entire Sales Force. *together with copy of company policy to entire sales force*

NOV. 24th   -   8.   Letter (prepared by Atwell, Brown and Nicely) to *and new zone price list*
all National Gypsum Company dealers advising them of
our new policy that will become effective midnight
December 18th.

NOV. 24th   -   9.   Letter to Region, Division and District Managers
detailing new Company policy together with new zone
price list.

[A3961]

## EXHIBIT 223

### PLAN OF ACTION

| | | |
|---|---|---|
| November 17th | 1. | Procure USG letter to dealer. |
| November 17th | 2. | Procure USG letter to Sales Force. |
| November 19th | 3. | Procure USG price list for all zones. |
| November 18th | 4. | Initial USG dealer letter to be wired by Nicely to all Region, Division, and District Managers. |
| November 19th | 5. | Each Region Manager to contact their respective Division Managers by phone to discuss contents of teletype message and the need for our Sales Force to start soliciting additional business at present prices. |
| November 19-20 | 6. | Division Managers to contact all Division Managers to discuss contents of teletype and the need for soliciting additional business at present prices. |
| November 24th | 7. | Atwell responsible for the preparation of new price lists by zones to make us competitive, to be mailed no later than November 24th to all Company internal departments, Field Sales Offices, Plant Offices, and Entire Sales Force, together with a copy of the Company Policy to entire Sales Force. |
| November 24th | 8. | Letter and new Zone Price Lists prepared by Atwell, Brown, and Nicely, to all National Gypsum Company dealers advising them our new policy that will become effective midnight, December 10th. |

[A3962]

## EXHIBIT 224
### PLAN OF ACTION

✓ NOV. 17    —   1.   Procure USG letter to dealer. ✓

✓ NOV. 17    —   2.   Procure USG letter to Sales Force.. ✓

✓ NOV. 19    —   3.   Procure USG price list for all zones. *have some*

✓ NOV. 19    —   4.   Initial USG dealer letter to be wired by Nicely ✓
                       to all Region, Division and District Managers.

   NOV. 19    —   5.   Each Region Manager to contact their respective
                       Division Managers by phone to discuss contents
                       of teletype message and the need for our Sales
                       Force to start soliciting additional business
                       at present prices.

   NOV. 19–20  —   6.   Division Manager to contact all District
                       Managers to discuss contents of teletype and the
                       need for soliciting additional business at
                       present prices.

   NOV. 24    —   7.   Atwell responsible for the preparation of new price
                       lists by zones to make us competitive to be mailed
                       no later than November ·24th to all Company internal
                       departments, field Sales offices, Plant offices
                       and entire Sales Force, together with copy of
                       Company policy to entire Sales Force.

✓ NOV. 24    —   8.   Letter and new zone price lists (prepared by Atwell,
                       Brown and Nicely) to all National Gypsum Company ✓
                       dealers advising them of our new policy that will
                       become effective Midnight, December 14, 1965.

[A3963]